### JACKSON, *ex dem.* Williams and Washburn, *vs.* MILLER.

A manuscript book found in a county clerk's office, where it had remained at least 17 years, purporting to be a *register* of sales made by a commissioner of forfeitures, under the act relative to confiscated estates, and containing, among other entries, an entry of a sale of a particular lot to a certain individual, not having the *signature* of the commissioner, containing no entry of a deed having been executed to the purchaser, and unsupported by proof that it was deposited in the clerk's office by the commissioner, or found among his papers and deposited by some other person, is not such evidence as will warrant a jury to presume a conveyance to the purchaser.

*Parol* declarations of a patentee, that his name was inserted in the grant for the benefit of a co-patentee, and that he had conveyed to him all his right in the tract, is not admissible in evidence to contradict the legal effect of the grant.

Such declarations might be admissible as secondary evidence of the existence and contents of a deed to a person who had left the country under an attaint, and probably taken with him or destroyed the evidence of his title; but to enable a party to avail himself of such proof, he must first shew that he has *actually* succeeded to the rights of the person to whom the deed is supposed to have been given.

In a grant for lands from the government where no consideration is paid for the land, a resulting trust cannot arise; nor will it arise in favor of a person who, in fraud of a regulation or law of the government, obtains for his benefit the names of a number of persons to be inserted in the grant as *nominal pa'entees.* If such nominal patentees refuse to convey, they will hold the land both at law and in equity.

Where a tract of land had been granted upwards of 50 years, and within 20 years after the grant subdivisions of the tract were known by specific numbers, and a particular lot was called or known as the lot of one of the pa-

tentees, and there was no proof of any claim of a tenancy in common by the patentees for more than 50 years, *it was held* that a *partition* might be presumed, and that the lot in question had fallen to the share of the patentee.

The admission of a party long after the time when he ought to have had a deed, had one ever existed, that he did not own the land, rebuts the presumption of a conveyance which would have arisen from the payment of the consideration money, and from a possession consistent with such presumption for a great length of time.

A person entering into possession of land as a tenant, or admitting the title of him under whom he enters, cannot legally *attorn* to a stranger, or dispute the title of his landlord; and every person entering *directly* or *mediately* under such tenant, or by his permission, stands in the same situation as the original tenant.

ALBANY,
Dec. 1830.

Jackson
v.
Miller.

ERROR from the supreme court. This was an action of ejectment, brought to recover lot No. 14, in a tract of land called Jessup's Little Patent, claimed to have been forfeited by the attainder of Ebenezer Jessup and three others, by virtue of an act of attainder passed the 22d October, 1779, and to have been sold by the commissioner of forfeiture for the district in which the lot was situate to General John Williams, the ancestor of one of the lessors of the plaintiff. The cause was tried at the Warren circuit in July, 1823, before the Hon. R. HYDE WALWORTH, then one of the circuit judges.

On the trial of the cause, it appeared that on the 21st May, 1768, a patent was granted to Ebenezer Jessup, Edward Jessup and thirteen others, of whom the *defendant was one*, of a tract of land containing 4100 acres; that as long since as 1789, the defendant told a witness that he had conveyed all his right in the patent to Jessup, with whom he lived as a servant boy when the patent was granted, and that his name was inserted as a patentee for the benefit of Jessup; which declarations he repeated in 1822. The plaintiff produced in evidence a *manuscript book*, found in the clerk's office of the county of Washington, in which office it had been since the year 1806, but when it was deposited there, did not appear; on the front page of which book was an entry in these words: "Registered for and by the direction of Alexander Webster, Esquire, commissioner of forfeitures for the eastern district of the state of New-York, in pursuance of an act entitled 'An

ALBANY,
Dec. 1830.

Jackson
v.
Miller.

act for the speedy sale of the confiscated and forfeited es-tates within this state and for other purposes,' passed 12th May, 1784 ;" and the last entry in which was in these words : " Sold John Williams, Esquire, the following lots of land, in Jessup's Little Patent of 4100 acres, in the town of Queensbu-ry in the county of Washington, to wit, number one, three, six, seven and *fourteen,* containing by estimation about 1400 acres of land, as the same are laid down and designated in the map or field-book thereof, special reference being thereunto had, for the sum of £233, forfeited by Ebenezer Jessup, Edward Jessup, Jonathan Jones and Daniel Jones, late of the coun-ty of Albany." The name of the clerk of the county was not subscribed to any part of the book, and the whole of the entries were in the hand writing of the ancestor of Williams, one of the lessors of the plaintiff. In 1795 or 1796, Isaac Washburn, the other lessor of the plaintiff, was in possession of lot No. 14, and applied to General Williams to purchase the lot of him. Williams gave him an agreement for a lease, and on the 26th March, 1802, executed a lease to him for the term of 999 years. From the time of the agreement for a lease until the 20th August, 1818, Washburn remained in possession, on which day the defendant was put in posses-sion by virtue of a writ of *habere facias possessionem,* issued on a judgment in ejectment obtained by him against Wash-burn, in a suit commenced by the defendant in 1814. In January, 1819, the present suit was commenced.

On the part of the defendant, it appeared that in 1791 the defendant executed a power of attorney to two persons of the names of Hall and Boyce, authorizing them to enter upon and take care of lot No. 14, to occupy it as their own, and prevent the destruction of timber. The power of attor-ney was not produced, but it was proved by two witnesses that they had seen it, and that Hall admitted that the lot was owned by the defendant. In 1792, Hall sold the lot to Washburn, one of the lessors of the plaintiff, who entered in-to possession, and whilst in possession admitted that he bought the lot of Hall under the power from the defendant, and that the lot belonged to the defendant. In 1796, Gene-

ral Williams admitted that he did not then, but would short-ly own the lot. A witness who had known the lot since 1788, stated that it had always been known as the *defendant's lot*, and spoke of other lots in the same tract. There was some slight circumstantial evidence that the power under which Hall claimed to act was not genuine.

A verdict was rendered for the plaintiff, subject to the opinion of the supreme court on a case to be made, with leave to either party to turn the same into a bill of excep-tions or special verdict. The supreme court gave judgment for the defendant. See the reasons of the supreme court, 6 *Cowen*, 751. The plaintiff thereupon turned the case in-to a bill of exceptions, and sued out his writ of error. The cause was argued here by

*D. Russell*, for the plaintiff in error.

*J. Tallmadge*, for the defendant in error.

The following opinion was delivered:

By the CHANCELLOR. Before I proceed to the examina-tion of the question whether the lessors of the plaintiff show-ed any legal title to the premises under the act for the sale of forfeited estates, I will briefly notice the possessory rights of the parties as between themselves, on the supposition that the property belongs to neither. There can be no doubt from the testimony, that Hall went into possession of the lot several years before Williams attempted to assert any claim to it, professing to enter by virtue of a written authority from Miller, and admitting his title. I do not consider it very ma-terial whether this power was executed by the defendant or was a forgery; but *odiosa et inhonesta non sunt in lege præ-sumenda*, is a legal maxim; and Lord Coke says, that in an act which partaketh both of good and bad, the presumption is in favor of what is good, because odious and dishonest things are not to be presumed. *Co. Litt.* 78. Buttolph, who went to Miller to purchase the lot about the time Hall took possession, says Miller told him he did not know Hall,

and had never given a power to any body in relation to the premises; but Darling, who went with him on the same errand and at the same time, says that Miller told him he could not let him or Buttolph have the lot, for he had given another man a power to go on to it. One of these witnesses certainly must have understood Miller, and then the legal presumption that Hall had not forged the power, which he exhibited with the defendant's name affixed thereto, must turn the scale in favor of the testimony of Darling: besides, he might well say he did not know Hall, for it appears from the testimony of Austin that Boyce was sent to the defendant by Hall for the power, and that it was made to Boyce and Hall jointly. Even if Hall entered without authority from Miller at the time, yet, as he professed to take possession for him and by his permission, there is another maxim which applies to such an entry. In civil cases, it is held that "Every consent given to what has already been done has a retrospective effect and equals a command." *Branch's Princ.* 108. Thus, in *Filchet* v. *Adams,* 2 *Strange,* 1128, an entry by a stranger without authority, in the name of the heir, for a condition broken, was held to be a valid entry of the heir, the same being afterwards assented to by him. So in *Goodtitle* v. *Woodward,* 3 *Barn. & Ald.* 689, where a notice to quit was necessary to be given by all the joint tenants of the estate, a notice given by an agent having a power from a part only, but signed by him as agent of the whole, was held to be binding on the tenant on whom the same was served, the power having afterwards been executed by the others. See also 3 *M'Cord's Law Rep.* 497, *note.* I consider it therefore established that Miller was in possession of this lot, by his tenant, long before Williams attempted to claim the possession or to exercise any acts of ownership over it; and that Washburn, who entered under Hall and admitting Miller's title, could not legally attorn to a stranger. The authorities to show that a person entering under another, either as his tenant or under an agreement to purchase, cannot dispute that title while he continues in possession, are collected by Mr. *Tillinghast,* in his notes to *Adams on Ejectment,* and are

conclusive on this question. *Tillinghast's Adams on Eject.* 217, *n.* 4 *and* 5. These authorities also show that every person entering directly or immediately under such tenant, or by his permission, stands in the same situation as the original tenant. Washburn was therefore rightfully turned out of possession under the ejectment commenced in 1814, and Williams cannot found a right of entry upon the possession of Washburn, or upon any possession of the premises. He can only recover by showing an absolute right to the property, or at least a better title than this possessory right of Miller.

The question then arises, has Williams shown such title? The patent was granted to the defendant and fourteen others, including the Jessups, who were attainted. It was subdivided into lots before the revolution, and this lot was always called or known by the name of the Miller lot. I think it may therefore be fairly inferred that the proprietors had made partition, and that this lot had fallen to the share of Miller; there being no evidence of any claim of a tenancy in common in any part of the patent for more than fifty years. But it is said Miller was only a trustee for Jessup, and that by the first section of the act of 1784, the legal title is vested in the purchaser although the attainted person was only a *cestui que trust.* It is true Miller stated to some of the witnesses that his name was only made use of for the benefit of Jessup; but such a trust cannot be raised by parol: these declarations contradict the legal evidence of the patent, and cannot be received for that purpose. A resulting trust might have been raised if Jessup had paid the purchase money and taken a deed in the name of Miller. But I apprehend no resulting trust can arise in a patent from the government, as in this case, where no consideration is paid for the grant. It may be and probably was true in point of fact, that Miller's name was made use of to obtain a grant for the benefit of Jessup, with whom he lived in the capacity of a servant. By the regulations of the government at that time an individual could not obtain a grant beyond a certain extent. It was therefore common to get the names of a great number of nominal patentees inserted to increase the extent of the grant, and then to obtain releases of their shares for little or

nothing. But this was in fraud of the government regula-
tion, and no resulting trust can be raised out of such a
transaction. If the nominal patentee did not think proper
to convey his share to the others, he was entitled to hold it
both at law and in equity. Perhaps these declarations, with
the additional admission that he had actually conveyed to
Jessup, who had left the country and carried off the deed, if
he ever had one, might, under the circumstances have been
proper evidence, not of disclaimer of title, but as secondary
evidence of the existence and contents of a deed which was
destroyed or removed out of the jurisdiction of the court and
beyond the power of the party to produce on the trial. *See*
16 *Serg. & Rawle's Rep.* 286, and 4 *New-Hamp. Rep.* 262.
But to enable a party to avail himself of such proof, he must
first show that he has actually succeeded to the rights of the
person to whom the deed is supposed to have been given ; and
that this is the best evidence of the existence and contents of
the deed within his power.

The lessors of the plaintiff produced no conveyance from
the commissioner of forfeitures to show that they had succeed-
ed to the legal or equitable rights of Jessup in relation to this
lot even if it actually belonged to him. I am also satisfied
they did not exhibit such evidence of their right as could le-
gally authorize the jury to presume the ancestor of Wil-
liams ever had such a conveyance. On the trial before me
as one of the circuit judges, I received in evidence the book
found in the clerk's office of Washington county, suppos-
ing it was the record of the abstracts which by the act of
May, 1784, 1 *Greenl. Laws,* 139, § 26, the clerk was reqir-
ed to make ; but upon a re-examination of the subject, I
now think it ought not to have been received in evidence for
any purpose. This section of the statute requires the commis-
sioners of forfeitures to make an abstract of all sales made by
him within his district—to contain the names of the purcha-
sers, the descriptions of the estates sold and the sums for
which sold ; the dates of the conveyances and the names of
the attainted persons to whom they were deemed to have be-
longed. At the end of every three months he was required
to file copies of such abstracts in the clerk's office of the

county where the lands lay which had been so sold. The clerk was also directed to record such abstracts in a book to be provided by him for that purpose. As I now understand this section the commissioner was himself to keep an abstract, from which he was to make transcripts quarterly for the several clerks of counties in which any land was sold, and that these transcripts were to be recorded by the clerks in a book to be kept for that purpose. To authorize the clerk to receive and record these transcripts thus quarterly returned to him, it would be necessary that they should be at least authenticated by the signature of the commissioner, or of some person legally authorized to make them. The entry on the first page of the book produced, does not show that it is a record of the abstracts filed by the commissioner, but a register of sales made for and by direction of the commissioner; and no signature of any person is attached thereto. If it is a genuine document I think it must be the original book of abstracts which the commissioner was himself to keep, and which probably was made and kept by General Williams as his clerk. If so, to make it legal evidence of the fact that this lot was even struck off to Williams, it should have been authenticated by the signature of the commissioner; or some proof should have been given that the book with this entry in it was found in the possession of the commissioner, or among his papers, if he was dead.

Another still more substantial objection to it, is, that if it is genuine it proves that no deed ever was given; because if a conveyance of the land was executed, it was made the duty of the commissioner to state the time of the execution of the deed in the abstract. By the 7th section of the act the purchaser was to pay one third of the purchase money down and to have a credit for the residue; and if the other payments were not made within the time prescribed, the first payment was to be forfeited by the purchaser. If there was legal evidence of the payment of the whole purchase money by Williams probably a jury might presume a conveyance, after such a lapse of time, if the possession of the property had been consistent with such a presumption; but here we have the evidence of Williams' own declarations as late as 1796,

that he did not then own the lot, though he told one witness he expected to own it in a short time. As the act of May, 1786, had limited the term of credit for the last two thirds of the purchase money, on sales, to the short period of four months, 1 *Greenl. L.* 277, and the business of the commissioner was transferred to the surveyor general in 1788, if the purchaser had not entitled himself to a conveyance, by the payment of the purchase money, long before 1796, the first payment, if made, was forfeited, and his right was absolutely gone. If the purchase money was paid there could be no difficulty in showing it, notwithstanding the death of the commissioner, by the semi-annual accounts rendered by him to the treasurer; which I presume must be preserved in some of the public offices.

On the whole, I am satisfied the lessors of the plaintiff had no legal right to the lot in question, and that the judgment of the supreme court should be affirmed.

The Court being unanimously of opinion that the judgment of the supreme court ought to be affirmed, it was affirmed accordingly.