ROOT, APPELLANT, *v.* DAVIS, RESPONDENT.

ADMINISTRATOR— *Qualifications*— *Drunkenness.* —In the case at bar, it appeared in opposition to the appointment of applicant for letters of administration of an estate that he drank intoxicating liquors, and to considerable extent at times, but it was not shown that he was incompetent thereby to transact important business. It appeared in defense that the applicant, for several years preceding his petition, had conducted a wholesale grocery business with such care, foresight, and attention as to acquire the reputation of being a conservative, successful, and clear-headed business man, and that other business men sought his counsel in business transactions; that since retiring from said grocery business he had attended to important business matters for a banking house, and also for the deceased; that his use of intoxicating liquors was temperate. *Held,* that in view of the evidence, the appointment of applicant will not be disturbed under section 59 of the Probate Practice Act, providing that "no person is competent to serve as administrator, who, when appointed, is . . . . adjudged by the court to be incompetent to execute the duties of the trust by reason of drunkenness, improvidence, or want of understanding or integrity."

SAME— *Improvidence.* —The charge that applicant is disqualified on the ground of improvidence, as provided in said section 59 of the Probate Practice Act, is not supported by proof of the fact that at the age of sixty-one he was not possessed of property of any considerable value, nor by proof that since 1885 he had not supported his wife and minor children, where it appeared that at that time a separation took place between the applicant and his wife, and he had not supported them since.

SAME— *Want of understanding.* —A charge of disqualification through want of understanding, as provided in said section 59, cannot be supported in the absence of evidence, and where such charge is incompatible with another charge affecting the integrity of the applicant, as an alleged design on the part of applicant to defraud certain heirs, and of a conspiracy to carry out such fraudulent purpose.

SAME— *Want of integrity.* —Want of integrity in the applicant, based upon the ground that he had testified falsely on a former occasion, is not supported by proof that three years before, when summoned for jury service, applicant had testified that he was a citizen of another State, and that in the trial of the case at bar he had testified that he had been a resident of this State for five years, where it clearly appeared that in giving such testimony he made a distinction between residence and citizenship.

CONSPIRACY—*Evidence—Administrator.*—In the case at bar, in support of an attempt to impeach the integrity of applicant by showing a design and conspiracy in connection with his brother to defraud certain heirs of the deceased of their shares of the estate, it appeared, in substance, that applicant, in reply to a remark by a niece of the deceased that the aunts would be surprised when they realized how much they would have, said that if their nieces and nephews did not put anything into their heads they would be satisfied with very little; that one aunt would be all right with a deed to the place where she was living and a few hundred dollars. That the niece remarked that those aunts would not be found such fools. To which applicant replied: "Well, if they do too much talking I will go in with Jeff (an alleged illegitimate son) and take every dollar. I can go into Iowa and prove anything, and it won't take much money to do it either." This was denied by applicant. It also appeared that at a meeting of certain relatives and heirs in the State of Massachusetts, immediately after the burial of the deceased, applicant's brother stated to those present that it would take from five to ten years to settle the estate in Montana, with which statement applicant agreed; also, that the estate was not as large as reported, and that there was a probability of large debts, and of trouble with the illegitimate son; that the brother then requested the heirs to give him written power to represent them, which they refused to do, upon the advice of the contestant. The contents of the writing were not shown. It appeared that beyond a brief conversation prior to the funeral, applicant had not seen his brother but once in the last thirty years. *Held,* that no design or conspiracy to defraud was established. (BLAKE, C. J., dissenting.)

CONSPIRACY—*Evidence—Conversations—Admissions.*—Where a conspiracy between applicant and his brother had not been proved, evidence of conversations between the brother and third persons, in which the brother was alleged to have disclosed fraudulent intentions as to other heirs, is inadmissible against the applicant, when such conversations were not within his hearing. Telegrams passing between applicant's brother and son are likewise inadmissible, where it is not shown that applicant had any knowledge of their contents.

ADMINISTRATOR—*Presumption as to bias—Integrity.*—It appeared in the case at bar that applicant's son claimed to own certain shares of bank stock, formerly belonging to the deceased, by virtue of a gift and actual delivery; that such stock was of the value of six hundred and sixty-five thousand dollars. *Held,* that no presumption could arise from this fact that applicant would be biased in aid of such claim so as to disqualify him upon the ground of want of integrity.

*Appeal from Second Judicial District, Silver Bow County.*

Application for letters of administration. The application of defendant was granted by McHATTON, J.

*Nathaniel Myers, Wade, Toole & Wallace, Frank E. Corbett, Stephen De Wolfe,* and *McConnell & Clayberg,* for Appellant.

Brief of *McConnell & Clayberg,* of counsel, for Appellant.

The question of the respondent's competency, within the statutory meaning of the word "incompetent," must be determined under the provisions of section 59 of the Probate

Practice Act, which provides that he must be adjudged incompetent by reason of drunkenness, improvidence, or want of understanding or integrity.

*Drunkenness.* We submit that this court should take a more liberal view of the statute in favor of the beneficiaries of the estate than has been taken by the New York and Pennsylvania courts. It has always been the purpose of the law in the administration of estates to administer them quickly, safely, and economically; and the duty of an administrator has always been to protect the estate, and expeditiously distribute the same. Now, in order to carry out the theory of the law in that regard, it certainly seems important that an administrator should be a man who is competent at all times to attend to the business affairs of the estate in a business-like manner, and the larger the estate the greater the reason for this. Can it be possible that one who is in a semi-drunken condition frequently, is fitted to attend to the administration of an estate of four and one-half millions of dollars? There is testimony tending to show that in many instances in the past respondent has been unfit to attend to any business because of intoxication; nor does he deny it. The danger of mismanagement, neglect, and want of power to exercise business ability upon important occasions, would seem to be too great in an estate of this kind to permit a man who frequently becomes under the influence of intoxicating liquors to be appointed administrator. He ought to be adjudged incompetent on account of drunkenness. We therefore submit that this court, in starting anew in this field, should give the statute such construction as will give effect to its spirit and the purpose of its enactment.

*Improvidence.* The New York authorities hold that improvidence, as a ground of incompetency under the statute, is such a want of care and forethought as would be likely to render the estate and effects liable to be lost and diminished in value; that it refers to such habits of mind and body as render a man generally, and under all ordinary circumstances, unfit to serve. Improvidence is defined by Webster as being "the quality of being improvident; want of providence or forecast; neglect of foresight." He defines the word "improvident" as follows: "Not provident; wanting forecast; not foreseeing or

providing for or against what will happen in future time; negligence; thoughtlessness." It will be seen from this that the New York courts have narrowed its meaning materially. But even under the New York definition we submit that the testimony in this case shows respondent to be improvident. He is sixty-one years old; he has no property; when he came to Butte, in 1885, he borrowed fifty thousand dollars from the deceased; he don't know whether it has been repaid or not. This is his own testimony. There is other testimony tending to show that he has practically been a pensioner upon the bounty of deceased, and of his own son, for some time past. For instance, it is shown by Mr. Gates, and not denied in the record, that his bills at the McDermott House, where he boarded, were settled by his son; and under his own testimony in giving an account of his business since the fall of 1888, he shows the truth to be as above stated. This testimony shows that he is absolutely insolvent. Now what stronger proof can be made of want of care and forethought than to show that a man sixty-one years old, who borrowed fifty thousand dollars five years since, is now absolutely insolvent and dependent upon the bounty of others for livelihood? Does not this show such habits of body and mind as to render him unfit to serve?

*Want of integrity.* We have been unable to find any judicial interpretation of this phrase, and there is nothing in the statute limiting or restricting its meaning. It must therefore be taken in its ordinary signification. Webster defines the word "integrity" as follows: "Moral soundness; honesty; freedom from every biasing or corrupting influence or motive; uprightness." If attempting to deprive his old, decrepit, and destitute sisters of all or a portion of their share in the estate; if the commission of perjury; if remaining silent when misrepresentations are made in his presence relative to their interests and to the estate; if entering into a conspiracy with one who is indebted to the estate in over a half million of dollars to cheat, defraud, and deprive the other heirs of their proper shares in the estate; if threats of joining with an illegitimate child and thereby withdrawing the whole estate from the other heirs be integrity, then John A. Davis is an honest man, and is surely not

incompetent on the ground of want of integrity. This court has the perfect right upon the question of appointment to take into consideration the unsuitableness of the person. Simply because the statute says that an applicant shall not be appointed if adjudged incompetent, upon the statutory grounds stated, does not preclude the court from refusing the appointment even though the applicant is competent within the statute, if he is otherwise unsuitable. A simple question ought to be conclusive upon this point. Could the court appoint himself administrator, although not incompetent for any reason mentioned in the statute, and first in order entitled to administration? The court should take into consideration upon this question of appointment, whether or not it is for the best interests of the estate and its beneficiaries to appoint a particular person. If such hostility has been shown by the applicant toward the other distributees, that the court believes that he would not be fair in the administration, it should refuse to appoint him. (*Drew's Appeal,* 58 N. H. 319.) So, if his interests are antagonistic to any of the distributees. (*Estate of Heron,* 6 Phila. 87.) So, if he is under the influence of one who has conspired against the distributees. (*Stearns* v. *Fiske,* 18 Pick. 24.) So, if he is insolvent. (*Cornpopst's Appeal,* 33 Pa. St. 537.)

The court erred in excluding the offered evidence of the admissions and statements of Erwin Davis, even though they were not made in the presence of respondent. The rule is, that where a conspiracy or confederation to defraud is shown *prima facie,* the admissions and statements of one of the parties to the conspiracy or confederation are admissible against the other, even though made in his absence. (Greenleaf on Evidence, § 111; Wharton on Evidence, § 1205; *Lincoln* v. *Claflin,* 7 Wall. 132; *Page* v. *Parker,* 43 N. H. 363; 80 Am. Dec. 172.) And slight evidence of the conspiracy or confederation is sufficient. (*McDowell* v. *Rissel,* 37 Pa. St. 164; *Confer* v. *McNeal,* 74 Pa. St. 115; *Benham* v. *Cary,* 11 Wend. 83; Wharton on Evidence, § 1206.) There was ample evidence of a conspiracy between respondent and Erwin Davis to defraud some of the heirs out of their just share and interest in said estate, and the court should have not only allowed but considered all testimony

relative to statements made by Erwin Davis in furtherance of the conspiracy.

*M. Kirkpatrick, Forbis & Forbis, Dixon & Drennan,* and *J. M. Woolworth,* for Respondent.

In the objections filed by Henry A. Root to the application of John A. Davis, the claim of the latter to letters of administration is attacked on all the grounds of incompetency mentioned in the statute, save only two. It is not alleged that he is under the age of twenty-one years, or that he has been convicted of any infamous crime. It is alleged that he is a non-resident, and "that he is incompetent to execute the duties of the trust by reason of each and every of the grounds of incompetency specified in paragraph 3 of section 59, page 290 of the Compiled Statutes of Montana," to wit, drunkenness, improvidence, want of understanding, want of integrity.

It appears from the evidence that Mr. Davis used intoxicating liquors, and sometimes, though rarely, to excess. To disqualify an applicant, otherwise entitled to letters of administration, on the ground of drunkenness, it must be shown that his habits of intemperance are so extreme and so inveterate as to unfit him entirely for the transaction of business, and destructive of his business capacity. "Drunkenness to constitute a disqualification must be habitual, continued, inveterate, and irremediable." (*Kechele's Case,* 1 Tuck. 52; *Berry* v. *Hamilton,* 54 Am. Dec. 522, n.; Schouler on Executors and Administrators, § 104.) That such is not the fact in this case we have shown by the testimony of many witnesses who stand in the front rank of the business men of Butte City, and who have known and transacted business with Mr. Davis for years. They all agree in attributing to him the character of a shrewd, alert, efficient, and thoroughly competent business man, and in this they are not contradicted, but corroborated by the witnesses called on this point by the appellant Root. It is not the mere use of intoxicating liquors which is made a disqualification by the statute; nor is it the habitual use, nor even the excessive use. Intemperance, drunkenness itself, is not a disqualification. All these, we know, may co-exist with a high order of ability and fidelity in the transaction of business. But the language of the statute is

that he must be adjudged by the court incompetent by reason of drunkenness. Incompetent for what? "To execute the duties of the trust," says the statute. He may use intoxicants, use them intemperately, excessively; yet if the court, upon the facts, cannot solemnly adjudge him incompetent to execute the duties of the trust, he is not disqualified under the statute. (7 Am. & Eng. Encycl. of Law, p. 176; Belknap's Probate Law, § 1369, pp. 44, 45.)

It has been held that the improvidence contemplated by the statute, as a ground of excluding a person from the office of administrator, is that want of care or foresight in the management of property which would be likely to render the estate and effects of the intestate unsafe and liable to be lost and diminished in value by improvidence, in case administration thereof should be committed to the improvident person. (*Coope* v. *Lowerre*, 1 Barb. Ch. 45.) And it has been held that a professional gambler is incompetent on this ground. (*McMahon* v. *Harrison*, 6 N. Y. 443; *Berry* v. *Hamilton*, 54 Am. Dec. 521, n. And see *Emerson* v. *Bowers*, 14 N. Y. 449.)

There is no evidence that Davis is a spendthrift or a gambler, or in any manner or to any extent improvident. On the contrary, he is shown to be a man of strict business habits. There is no evidence showing Davis to be insolvent or bankrupt. He is accused of owing the deceased fifty thousand dollars, but there is nothing in the record to warrant the statement; but on the contrary, it is shown that the present firm of Davis & Co. owe that amount, and John A. Davis is not a member of the firm. We do not much fear that the court will measure a man's improvidence by his accumulations. If it should, the only inquiry it should make is as to who, of all the applicants, is best provided with worldly goods. For if the argument of counsel is to have weight, improvidence becomes a relative term, to be measured by the length of the purse. As compared with the very rich, those who are satisfied with a competency are improvident, and those who have failed to provide for an easy old age, we suppose, should be called vagabonds. The argument must reduce itself to this.

The charge of want of understanding is refuted by the same

evidence which establishes the high standing of respondent as a capable business man.

That John A. Davis is a man of integrity in the ordinary and usual sense of the word, in which sense it is to be presumed it is employed in the statute, is established by the uncontradicted testimony of many witnesses, speaking from intimate personal knowledge of his character and standing in this respect in the community where he lived for years, engaged in the transaction of large and important business. The men who had met him in business, and transacted business with him, were unanimous in support of his character for integrity. The appellant was unable to produce a single witness to impeach it, or who would undertake to say that John A. Davis had ever been guilty of a dishonest act. But it is contended that the want of integrity on respondent's part is shown by certain evidence, in part produced, and in part offered and erroneously excluded by the trial court tending to prove, and which, in the view of the appellant, would have established a design on the part of the respondent to divert the estate from its legitimate channels by defrauding certain of its heirs, namely, the sisters of the deceased who are old and feeble, of their proper share in the estate. The evidence of this design, so far as produced, consists in part of the testimony of Mrs. Ellen Cornue, a niece of the respondent, and a sister of the appellant, whose testimony is rebutted by that of John A. Davis, and completely refuted by his actions, both before and after the meeting at the Massasoit House, in Springfield, Massachusetts, hereafter referred to. Without remarking upon the inherent improbability of the testimony given by Mrs. Cornue as to this conversation, namely, that a man of the known and established integrity of character of John A. Davis, as shown by the whole tenor of his business life and conduct, could have entertained a purpose so base as that attributed to him; and the further improbability that had he been capable of it, he would have been so unwary as to reveal his design in a casual conversation to a person in no way implicated in the scheme, and in fact directly interested to frustrate it, — it will suffice to point out that everything in this testimony of Mrs. Cornue which could in any degree affect the character of John A. Davis for integrity of purpose is contradicted or completely explained away by his

rebutting testimony. Therefore, falling as it does under the general rule as to conflicting evidence, the whole may be dismissed without further consideration.

It is further insisted that John's want of integrity is shown by what counsel calls perjury. The unpardonable perjury of which John is accused was committed, so it is alleged, about the year 1887, before the District Court in Butte City. John having been summoned as a grand juror, excused himself upon the ground that he was not a citizen of Montana, nor had not at that time decided whether he would remain or not. However difficult it may be for counsel to draw a distinction between the fact of living in a place and the permanent residence there, which arises from the joint act of residence and the intention to make that residence permanent, the law has fixed that distinction beyond controversy. Without reviewing the evidence in detail we invite the inspection of the record by the court, and we have little doubt that the court will find the facts to be, that while John lived in Butte for nearly five years, that he has been actually a resident of Montana for only one year. Or in other words, that his intention to remain was only arrived at about one year previous to the trial. It is also urged that a want of integrity is show in John Davis by the conversation reported by Mary Cummings, in which John said, "I can go in with the boy and take the whole." After some remark by Mary Cummings, Erwin, who was present, said, "No, no, he does not mean that." It is urged that this testimony is uncontradicted, and that John did not dare go upon the stand to give his version of what transpired. Whether John could have contradicted these statements or not we do not know, for the record does not show. We may therefore admit that such report of the conversation is correct. Viewing the conversation in the light of human nature as we see it every day, and giving to it such weight as any reasonable person would give to so unimportant a matter, it occurs to us that it would have been worse than useless to have attempted to contradict it, whether true or false. No man reaches that stage of dignity where he does not at times indulge in light and sometimes idle talk. Erwin and John at this juncture in the story were preparing to go to Montana, to attend to the settlement of the estate.

They were anxious to have the heirs act in harmony in the matter. Root had poisoned the mind of Mrs. Cummings against both Erwin and John. The matter had culminated in a family quarrel, in which each party wanted the aid of the heirs against the other, and each was anxious to strengthen his position by securing the co-operation of the greater number of heirs; and when John saw that his sister's mind had been poisoned, and that she would not trust either him or Erwin in the matter, he was very naturally disappointed, and perhaps angry, and made the remark stated, which in the light of attending circumstances meant nothing more or less than if he had said: "This action causes faction, which weakens the general cause and strengthens those who claim against us. In such a case one might better cast his lot with the Iowa boy." The whole fabric of John Davis' dishonesty is built upon a dark and unnatural logic, and upon an obvious misconception. Before the facts as contained in this record would justify us in believing anything evil or malicious of him, we must first assume that he is a man totally depraved, without honor, principle, or truth; one who loves perjury, evil, conspiracy, ill-gotten gain, and all things else that make up, not a man, but a fiend, such as he has been portrayed before this court. If the court will so assume for John Davis this malevolence, then may the court arrive at the conclusions urged upon it. But if the court will attribute to him ordinary humanity, worse than that, if the court will say that he is below the grade of human integrity, and yet will assume that he possesses a remaining vestige of good, the court may read all that is charged to him in the statement and yet conclude that it is not inconsonant with an honest purpose.

It is further contended, however, that a conspiracy existed between John A. Davis and his brother Erwin Davis, to effect the same nefarious purpose mentioned above; and on the basis of such conspiracy it was sought to affect John A. Davis, with certain declarations and statements attributed to his alleged confederate, Erwin Davis, made in the absence and without the hearing of John A. Davis. The court excluded all evidence of such declarations, on the ground that there was no proof of the alleged conspiracy; and this ruling of the court is assigned for error. Of course, if there was no sufficient proof of the

alleged conspiracy, the evidence of such declarations was inadmissible. What evidence was there of a conspiracy? None whatever. There was no evidence of preconcert, agreement, or common design. It is contended, however, that such proof is afforded by the statements of Erwin Davis in addressing a meeting of the heirs at the Massasoit House in Springfield, Massachusetts. (The substance of the address is found in the opinion of the Court. — Reporter.) Now John A. Davis was present at this meeting from the beginning to its close, and with the exception of his reply to the question of Erwin Davis respecting the time required to administer upon an estate in Montana, it does not appear that he made any remark whatever to any one. With the exception named, he neither corroborated nor denied any statement made by either of the speakers. This silence is relied upon as evidence of the conspiracy between himself and Erwin; but it is not shown that any statement made by Erwin was untrue to the knowledge of John A. Davis, or untrue at all, except his alleged statement as to the rights of an illegitimate son. And obviously this was misunderstood by the witnesses. He could not have said, without qualification, that an illegitimate son would take the whole estate. He was speaking in the presence of an assemblage of intelligent men and women, and it is a matter of common knowledge that in our country illegitimate children, unless legitimated or acknowledged, do not inherit. Again, a conspiracy is charged to defraud certain of the heirs of their interests in the estate. But nothing was said by Erwin at the meeting which indicated in the remotest degree such an intention. His declared object was to obtain from the heirs authority to act for them in procuring the appointment of an administrator, and possibly to act in the further management of the estate with reference to anticipated litigation. All that he said was consistent with this purpose only. But this is not the purpose charged, and it was a purpose entirely lawful and proper under the circumstances of the case. It was on the whole a wise and conservative address. He knew something of the difficulties in the way, and it was the part of wisdom on such an occasion to abate rather than encourage the extravagant anticipations of the heirs. Nor does it appear that there was at any time any effort or proposal

made by Erwin or John to purchase or otherwise acquire the interest of any of the heirs. As to the amount of the debts, it is not certain that Erwin Davis stated that they would be large, or that he or John had any definite knowledge on the subject. As to there being a will, Root himself testifies that Andrew J. Davis told him that in order to put Erwin off, he had stated to Erwin that he had made a will; and so Erwin was justified in making the statement that there had been a will.

It appears that the petition of John A. Davis for letters of administration was prepared and verified on the thirteenth day of March before leaving Butte to attend the funeral at Springfield, but was not actually filed until the 28th of that month. It was contended that his failure to divulge at the meeting the fact that he had prepared such a petition was evidence of bad faith or lack of integrity. But the reply is, that there was nothing in the circumstances of the meeting which called for a statement of that fact; nor did the fact itself have the slightest tendency to prove bad faith on the part of John A. Davis. Looking at the petition, there is no suppression of truth or suggestion of falsehood to be found in it. The names, residences, relationship to the deceased, and interest in the estate of each and all of the heirs are therein carefully set forth, and the estimated value of the estate is alleged to be four million five hundred thousand dollars. Soon after the meeting the petition was actually filed in the court, and in the face of this public and verified statement of all material facts relating to the estate, and full recognition of the rights of all the heirs therein, and in the absence of all proof that he has attempted, directly or indirectly, to acquire the interest of any of the heirs, it seems preposterous to charge that John A. Davis ever entertained the fraudulent design attributed to him.

John A. Davis, testifying in rebuttal, denied fully and completely the existence of the alleged conspiracy, and denied any intention on his part to wrong or defraud any of the heirs; and testified that if any such design was entertained by Erwin Davis the fact was utterly unknown to him. There being no evidence of the alleged conspiracy between John A. Davis and Erwin Davis, the court properly excluded all testimony of declarations made by Erwin Davis in the absence and without the hearing

of John A. Davis, tending to prove such fraudulent design on the part of Erwin, and offered for the purpose of affecting the integrity of John A. Davis.

The rule is that acts and declarations of alleged co-conspirators are not admissible against a co-defendant until his connection with the common purpose has been shown *aliunde*. The conspiracy and the connection of the party therewith must be made out by other evidence than the declarations themselves. (*Wiggins* v. *Leonard*, 9 Iowa, 194; *Ford* v. *State*, 112 Ind. 373, 383; *Spies* v. *People*, 3 Am. St. Rep. 488, n.; Wharton on Evidence, § 1206; *State* v. *Daubert*, 42 Mo. 239.) A previous concert to effect the unlawful purpose is necessary or there is no conspiracy. There must be some arrangement; a union or concert of two or more minds in a thing done or to be done. And in the absence of a combination, declarations are only evidence against the party making them. (*Oldham* v. *Bently*, 6 Mon. B. 428, 441; *Spies* v. *People*, 3 Am. St. Rep. 475, 476, 488, 490.) For the same reason the court did not err in striking out the statements of Erwin Davis to Mrs. Cornue in the hall door of the room at the Massasoit House, to the effect that "if it had not been for those remarks of Henry's, I could have made millions of dollars out of this;" also in refusing to admit any of the conversation between those parties. The court did not err in excluding the telegrams which passed between Erwin Davis and Andrew J. Davis, Jr., John A. Davis being unaware of said telegrams, or the contents thereof. For the same reason the court did not err in refusing to permit Henry A. Root to testify to statements made to him by Erwin Davis before the meeting at the Massasoit House, or in rejecting the offer to prove the facts proposed to be proven by Henry A. Root while a witness on the stand, touching declarations and statements of Erwin Davis to him, or in sustaining the objections to the offer to prove the facts, and any thereof, by said witness. The court did not err in admitting evidence of the general reputation of John A. Davis for integrity. The statutory disqualification in question is "want of integrity." The issue involved directly the integrity of John A. Davis. Upon such an issue, we contend the only legally admissible evidence is evidence of general reputation. In impeaching the credit of a witness, which bears

a strong analogy to the purpose here in view, "the examination," says Mr. Greenleaf, "must be confined to his general reputation, and not be permitted as to particular facts; for every man is supposed to be capable of supporting the one, but it is not likely that he should be prepared to answer the other without notice; and unless his general character and behavior be in issue he has no notice. This point has been much discussed, but may now be considered at rest. The regular mode of examining into the general reputation is to inquire of the witness whether he knows the general reputation of the person in question among his neighbors, and what that reputation is." (1 Greenleaf on Evidence, § 461.) "Look ye," said Lord Holt, "you may bring witnesses to give an account of the general tenor of the witness' conversation, but you do not think, sure, that we will try, at this time, whether he be guilty of robbery." (*Rex* v. *Rockwood,* 4 St. Tr. 681.)

In this connection we desire to earnestly urge our objection to proving the want of integrity by specific acts. If the law does not permit this character of proof, then appellants have no evidence whatever upon which to charge the lack of integrity in John Davis. We assert with every assurance of correctness that no characteristic of the human mind or heart has ever been or can ever be proved in a judicial tribunal by proof of specific acts. If we seek to prove a man's character for honesty, integrity, truth, peacefulness, or any moral trait, the law requires us to prove his general reputation, and does not permit the courts to be transformed into schools for scandal, where every person who claims a grievance is given an audience for all the small talk which courts will not condescend to hear. A common and a true saying is to the effect that "every story has two sides." Probably no man exists who has not some enemy who honestly believes in his want of some moral trait. How absurd it would be if a man whose character in a community was above reproach should be arraigned, not upon his general reputation, but upon complaints of those who may imagine themselves injured!

The facts in this case enforce the reason of the rule: John Davis is not charged with any offense. He has not conspired with any one to do any wrong. He has not swindled any of

the heirs, nor has he stolen any of the estate. The most with which he is charged is a design to do these things. To say the least, or the most of it, the whole matter is altogether unsatisfactory, shadowy, and lacking in the substance of facts. He is accused of perjury by one counsel in his written brief, and also of an "inveterate blackness of heart," whatever that may mean. And yet it would be most unfair and unjust toward Mr. Davis for the court to accept as true these intemperate accusations without more reliable proof. The fact that the statute provides that conviction for crime constitutes disqualification shows what specific acts might be proved, and that the lack of integrity must be proved in the usual manner, and not as attempted upon the trial.

Briefs in reply were filed by *John B. Clayberg,* and *E. W. Toole,* of counsel for Appellant.

HARWOOD, J.—This is an appeal on behalf of Henry A. Root, an applicant for letters of administration on the estate of Andrew J. Davis, deceased. On the eleventh day of March, 1890, as appears by the record, Andrew J. Davis, then a resident of Butte City, Silver Bow County, this State, died at that place, leaving an estate of the estimated value of four and one half or five million dollars. Among others, John A. Davis, a brother, and one Henry A. Root, a nephew, of deceased, petitioned the District Court, exercising its probate jurisdiction under the Constitution, for letters of administration on said estate; and each of said applicants also filed objections to the appointment of the other. (Prob. Prac. Act, § 64.) These petitions and contests were heard and determined by the court making an order overruling all objections to the appointment of John A. Davis, and granting to him letters of administration upon said estate. *Appellant,* Henry A. Root, thereupon made a motion for new trial in said matter upon the following grounds: *First.* Insufficiency of the evidence to justify the judgment, decision, and order of the court, and that the same is against law. *Second.* Errors of law occurring at the trial and excepted to by the party making this application. (Prob. Prac. Act, §§ 323–327; Code Civ. Proc. §§ 295–301.) Motion for new trial was made upon a statement of the case, and being

heard by the court, was overruled, and this appeal was taken both from the order overruling motion for new trial, and from the judgment and order of court granting letters of administration to John A. Davis.

Our statute (§ 55, Prob. Prac. Act), provides the order of precedence in which letters of administration must be granted as follows: "Letters of administration on the estate of a person dying intestate must be granted to some one or more of the persons hereinafter mentioned, who are respectively entitled thereto in the following order: *First*, the surviving husband, or wife, or some competent person whom he or she may request to have appointed; *second*, the children; *third*, the father and mother; *fourth*, the brothers; *fifth*, the sisters; *sixth*, the grandchildren; *seventh*, the next of kin entitled to share in distribution of the estate; *eighth*, the public administrator; *ninth*, the creditors; *tenth*, any person legally competent." The persons, however, entitled to letters of administration as prescribed in the foregoing section are subject to a provision of the same section, to the effect that "no person who is not a resident of this State shall be appointed administrator;" and also to the provisions of section 59, as follows: "No person is competent to serve as administrator or administratrix who, when appointed, is, *first*, under the age of majority; *second*, convicted of an infamous crime; *third*, adjudged by the court to be incompetent to execute the duties of the trust by reason of drunkenness, improvidence, or want of understanding or integrity." In section 64 of the Probate Practice Act it is provided that "any person interested may contest the petition by filing written opposition thereto on the grounds of incompetency of the applicant." Under the provisions of these statutes it is clear that letters of administration "must be granted" to applicants in the order prescribed by statute, to the exclusion of others, unless the applicant is disqualified by reason of being a non-resident of this State, or a minor, or having been convicted of an infamous crime, or adjudged by the court to be incompetent to execute the duties of the trust by reason of drunkenness, improvidence, or want of understanding or integrity. Respondent, John A. Davis, occupies a place precedent to appellant, Henry A. Root, in right to letters of administration upon this estate by the pro-

visions of statute, and unless respondent be disqualified by reason of some disability mentioned in the statute, his appointment was properly made by the court, and must stand. (McGregor v. McGregor, 33 How. Pr. 456.)

The objections set up by appellant against the appointment of John A. Davis are, *first,* that he is a non-resident of this State; *second,* that he is incompetent to execute the duties of the trust by reason of drunkenness, improvidence, want of understanding, and integrity. Evidence was introduced in support of these allegations on the part of Henry A. Root, as well as evidence as to the qualification of John A. Davis, and in his defense against the objections to his appointment. The assignments of error contained in the record relate, *first,* to the alleged insufficiency of the evidence to justify the findings of the court against the alleged causes of incompetency; and *secondly,* to errors of law, alleged to have occurred at the trial, and excepted to by appellant. These matters will now be considered in the order set forth in the record. .

The first ground of error assigned is, in effect, that the evidence is insufficient to support the finding of the court that respondent was not disqualified, and should not be adjudged incompetent by reason of drunkenness. Upon a careful review of all the evidence introduced, we find no error in the conclusion reached by the court below upon this question. This question does not turn upon the fact that the applicant is shown to be in the habit of using intoxicating liquor to some extent. However reprehensible that habit may be as regarded from a moral point of view, it is not within the province of the court to deny letters of administration to an applicant on the ground of mere use of intoxicants. The drunkenness contemplated by this statute undoubtedly is that excessive, inveterate, and continued use of intoxicants to such an extent as to render the subject of the habit an unsafe agent to intrust with the care of property or the transaction of business. It is a matter of common knowledge that the appetite for intoxicating liquor takes such strong hold upon some individuals as to become a controlling influence. The appetite strengthens by each successive indulgence. The will force becomes too feeble to resist the craving of the appetite; indulgence is unrestricted, constant,

and excessive. A person so controlled by such an appetite may be said to be abandoned to the habit of drunkenness. The unfortunate effect of this habit is to render the subject of it, not only physically and mentally incompetent to transact business of importance, and preserve property with due care, but usually the subject of this habit becomes indifferent to the most sacred duties, and careless of demands of the highest moment. Such a person may well be adjudged incompetent to execute the duties of the trust involved in the administration of an estate. It is undoubtedly easier to prove the fact, and the disqualifying effect of drunkenness, than to define the degree of intemperance necessary to produce incompetency. The vital question in the investigation of this objection is whether or not the applicant for letters is *incompetent* by reason of the inveterate use of intoxicants, and not whether he may or may not have used the same to some extent.

In the case at bar it is admitted by appellant's counsel that the evidence introduced to establish the incapacity of John A. Davis by reason of drunkenness is meager. Witnesses introduced in support of that charge testified that he drank intoxicating liquor, and some testified that he used the same to considerable extent at times, yet none of these witnesses would undertake to say that he was incompetent to transact important business; nor did they testify to other facts from which the court could reasonably draw that conclusion. In defense against this allegation it was proved by a number of witnesses on behalf of respondent, that during his residence in Butte City, since the fall of 1885, up to the fall of 1888, he was engaged in the wholesale grocery business at that place as the senior member of the firm of Davis & Co.; that he was attentive to that business, and conducted it with such care and foresight that he acquired the reputation of being a conservative, successful, and clear-headed business man, and that other business men of that city sought his counsel in reference to business transactions. The testimony introduced on behalf of John A. Davis shows that since the fall of 1888, when he retired from said wholesale grocery business, he has been engaged in attending to important business matters for the First National Bank of Butte, and also for the deceased, Andrew

J. Davis, such as looking after claims owing to said bank, rebuilding the said bank after its destruction in the fall of 1889, and attending to important litigation in Iowa for deceased. The testimony of these witnesses as to the respondent's habit of using intoxicating liquor is to the effect that his use of the same was temperate. We think the court properly found upon the proof that the applicant was not incompetent by reason of alleged drunkenness. (See *Ketchele's Case,* 1 Tuck. 52.)

Improvidence was set up as ground of disqualification of respondent, and it is urged that the court erred in finding that the same was not established by the evidence. In support of this ground of disqualification, our attention is called to two facts shown by the evidence. *First,* that respondent, at the advanced age of sixty-one years, is not possessed of property of any considerable value; *secondly,* that since 1885 he has not supported his wife and minor children. As to the latter fact, the evidence shows that a separation took place between respondent and his wife in 1885, and that he has not supported his wife and two minor children since that time.

These facts do not tend to prove either the providence or improvidence of respondent. He may have attended all his transactions in reference to the management of property with the best of foresight, and "hoarded his gain with a miser's care," and yet not supported his wife and children. Nor does the fact that respondent has no estate, standing alone, sustain the charge of improvidence. (*Emerson* v. *Bowers,* 14 N. Y. 449.) Improvidence is defined to be a want of care and foresight in the management of property. (*Coope* v. *Lowerre,* 1 Barb. Ch. 45; Webster's Dict. 10 Encycl. of Law, 321.) The symptoms of an improvident temperament would, evidently, be carelessness, indifference, prodigality, wastefulness, or negligence in reference to the care, management, and preservation of property in charge.

It is said in *Coope* v. *Lowerre, supra:* "The improvidence which the framers of the Revised Statutes had in contemplation, as a ground of exclusion, is that want of care and foresight in the management of property which would be likely to render the estate and effects of the intestate unsafe, and liable to be lost or diminished in value by improvidence, in case administration thereof should be committed to such improvident person."

We do not find in the record any evidence to show that respondent possesses, or has exhibited, in reference to property, the characteristics which constitute improvidence. On the contrary, there is evidence showing that he has been engaged extensively in mercantile business; that he has been intrusted with the custody, care, and expenditure of large sums of money, and the superintendence of undertakings of importance, involving large expense; and in none of these matters is it shown that respondent was wanting in foresight, care, and diligence in the management and preservation of the property committed to his charge. The court appears to be fully sustained by evidence in its finding that respondent is not disqualified by reason of improvidence. (*Coope* v. *Lowerre, supra; Emerson* v. *Bowers, supra; McMahon* v. *Harrison*, 6 N. Y. 443; *Coggshall* v. *Green*, 9 Hun, 471.)

Want of understanding was alleged as a ground of disqualification of respondent, and the finding of the court against the existence of that fact is assigned as error, on the ground that such finding is not supported by the evidence. This proposition is not supported by any evidence found in the record; the tenor of all the evidence is to the contrary, and, moreover, the charge is incompatible with another charge and theory wrought out of the evidence, to be further considered, namely, an alleged design on the part of respondent to defraud certain heirs of their rightful shares of said estate, and an alleged conspiracy entered into by respondent with others to carry out that fraudulent purpose. Not only the tenor of the evidence, as we view it, but the construction put upon the evidence by appellant's counsel, contradicts the allegation that respondent is wanting in understanding.

The further and last ground of disqualification urged by appellant against the issuance of letters of administration to respondent is "want of integrity." The finding of the court against that alleged disqualification is assigned as error, for the alleged reason that such finding was not supported by the evidence. In passing upon this question it will be necessary, also, to consider and determine the alleged errors of law assigned in reference to the exclusion of certain testimony offered at the trial on behalf of appellant. In addition to the fact that "con-

viction of an infamous crime" absolutely disqualifies an appli-
cant for letters of administration, the question of the integrity
of the applicant may be raised, and be made the subject of ju-
dicial investigation and judgment.   If judgment be pronounced
to the effect that the applicant is incompetent to execute the
duties of the trust, by reason of want of integrity, letters shall
not issue to him.   (Prob. Prac. Act, § 59.)   Just what degree of
moral delinquency would justify the court in proceeding to that
judgment is not clear.   Undoubtedly the accusations upon
which a court should base this judgment ought to be certain
and grave in their nature, and be established by proof which
would at least approach the certainty required for conviction
in criminal prosecutions.   An abandoned person may be guilty
of many dishonest transactions not punishable by our Criminal
Code as an "infamous crime," which nevertheless would indicate
such moral turpitude, such baseness of character, such want of
integrity and conscientious honesty of purpose, as to render
him unworthy of the trust involved in the administration of an
estate.   Under this statute proof may be made of such depraved
conduct as would impeach an applicant's integrity, and justify
the court in adjudging him incompetent by reason of "want of
integrity."

The testimony which appellant insists indicates a want of
integrity on the part of John A. Davis will now be examined.

It appears by the testimony of respondent, that about three
years ago, on an occasion when he was summoned as a grand
juror for Silver Bow County, on his examination under oath
as to his qualifications to act as such, he excused himself from
such service by saying he was a citizen of Chicago.   This fact,
coupled with the further fact that respondent testified in the
trial of this case that he had resided in Silver Bow County
since the fall of 1885, is construed by appellant's counsel as
showing that respondent has falsely testified, either in one case
or the other.   We think it is a self-evident proposition that
one who deliberately and knowingly violates the sanctity of his
oath is wanting in integrity.

One of appellant's counsel asserts in his brief that John A.
Davis, "being examined under oath, in order to escape jury
duty as a citizen, he falsely testified that he then resided in

Chicago, and that he did not reside at Butte, and so escaped jury service." This is a grave charge, but the evidence does not support it.

Respondent Davis, testifying in this respect, said he had *resided* in Butte ever since the fall of 1885. He was residing there when summoned to serve on the grand jury, and as to that matter he says in his testimony: "I excused myself on account of citizenship about three years ago. I think in that conversation I told the judge, probably, that I was not a citizen here. I think that was as much as two years ago. I know the judge asked me at the time if I intended to become a citizen here. I told him I had not decided; I told him I was a citizen of Chicago."

In viewing this evidence it appears very plainly that the respondent made a distinction between *residence* and *citizenship*.

There is no other evidence on this matter than the testimony of respondent. It is simply the evidence of respondent as to his intention respecting his citizenship, and the expression thereof before the court two or three years ago. It is not uncommon for a man to dwell or reside in one country and at the same time claim his citizenship in another. We find nothing in this evidence to justify the inference drawn therefrom by appellant's counsel.

Appellant further undertakes to impeach the integrity of John A. Davis, by attributing to him a design to defraud certain heirs of said estate of there rightful shares thereof, and in furtherance of such design, a conspiracy entered into by respondent, John A.; and his brother Erwin to carry such purpose into effect. To establish this fraudulent design and conspiracy, appellant's counsel point, first, to the testimony of Mrs. Ellen Cornue, a sister of appellant, Henry A. Root.

It appears by the record that during the last illness of deceased, Ellen Cornue was summoned from New York State, by telegram, to visit her uncle Andrew. In her testimony on behalf of Henry A. Root, the appellant, she relates that soon after her arrival in Butte City she learned from the attending physician that her uncle could not survive many days. That upon learning this, she said to her uncle John, the respondent, "What a surprise it would be to those

aunts down there when they realize how much they will have;" that he replied, saying: "If their nieces and nephews do not put anything into their heads they will be satisfied with very little. Diana should have the place where she is living. We will give a deed to her, and a few hundred dollars, and she will be all right." That she then remarked to her uncle John that he would not find those old aunts such fools as he thought they were, to which John A. replied: "Well, if they do too much talking I will go in with Jeff and take every dollar. I can go into Iowa and prove anything, and it won't take very much money to do it either." It appears by the record that the person referred to as "Jeff" is an alleged illegitimate son of deceased.

After Ellen Cornue related that conversation as aforesaid, John A. Davis testified as to the same conversation. His version of it contradicts Ellen Cornue's evidence in that respect, except that they both agree that she commenced said conversation. It does not appear that on any occasion John A. introduced such subject, nor any subject kindred to the one mentioned in said conversation, although he was in company with his niece, Ellen Cornue, frequently at Butte City, and they traveled together thereafter from Butte, Montana, to Springfield, Massachusetts; nor does it appear that John A. sought to persuade this niece, or any one who had knowledge of the vast estate left by deceased, to join him in suppressing that knowledge from other heirs, or in defrauding or misinforming them as to the estate. On one occasion alone this niece introduced a conversation as to the surprise that awaited the other heirs, and according to her narrative, John A. intimated that he harbored improper intentions toward other heirs. This he emphatically denies, and gives a different version of said conversation.

The most that can be said of this evidence is that it is conflicting, and the court, having the witnesses before it, decided between the conflicting statements. The well-established rule often announced by this court is that in such a case the decision will not be disturbed.

We pass to another incident connected with this branch of the case upon which counsel for the appellant lay great stress, as bearing upon the alleged evil designs of John A. Davis

against certain other heirs. It appears by the testimony that immediately after the death of Andrew J. Davis the remains of the deceased were conveyed to the family burying place near Springfield, Massachusetts, for interment. After the funeral, on the evening of the same day, a number of the relations and heirs of the deceased being present at the Massasoit House in Springfield, they met together to consider what action was proper on their part in reference to the estate of deceased. There was present at this meeting respondent, John A. Davis, his brother Erwin, and several of his sisters, also appellant, Henry A. Root, and some other heirs of deceased. Erwin Davis first made some remarks there, in which he said, in effect, that deceased may have left a will; that there was a will made by deceased at one time. He also said that the estate was not as large as had been reported, and suggested the probability of large debts existing against the estate, and mentioned the fact that it was reported that deceased had an illegitimate son in Iowa, whose claims may be set up, and litigation involved thereby, and suggested something about the advisability of attempting to settle with said son to avoid scandal; that he thought the estate could be settled in five years if there was a will, but that it would take ten years if there was no will. As to this last remark, in reference to the time required to settle the estate, he turned to John A. and asked him if he thought the statement about the time was correct, and John A. assented to the correctness of that statement. Erwin further suggested that some one should be appointed by the heirs to represent their interests in Montana, and said he supposed they would think him a proper person to represent them and look after their interests. This he said he would do if they so desired, and empowered him so to do, and he suggested that they sign a paper giving him such power.

The remarks of Erwin Davis at said meeting are repeated with considerable variation, in important features, by some seven witnesses who were present, and who testified on this hearing on the part of the appellant Root. For instance, it is observed that some of these witnesses report Erwin as making the remark, when he referred to said estate, " If there is any estate," while Henry A. Root, the appellant, a lawyer by profession, Mr.

Herbert P. Cummings, a business man, and Mrs. Elizabeth S. Ladd, a niece of deceased, who were called as witnesses against John A. Davis, and related the remarks of Erwin Davis at said meeting, do not report him as making such a remark.

Mr. Cummings testifies that Erwin, in the course of his remarks at said meeting, said: "If there was any estate for us it would be obtained after a great deal of litigation." In the same connection, according to this witness, Erwin spoke of the "supposed illegitimate child, and said there would be either eleven heirs or one, and that in an emergency some person should be given authority to act in regard to him if anything came up."

After Erwin Davis finished his remarks, appellant Root made some remarks to those assembled, in which he, in effect, contradicted or modified the statements made by Erwin, and advised the heirs not to sign any power of attorney or other paper as suggested by Erwin, at least until they had advised with counsel. This appears to have ended the meeting.

It is shown that after the meeting Erwin and John A. still advised their sisters to sign the paper authorizing Erwin to represent them concerning their interests in Montana, but in what respect and to what extent this paper authorized him does not appear. It is intimated by appellant's counsel that said paper may have been a document of different purport from that represented by Erwin. That document, however, does not appear in evidence, nor does any witness state anything as to its contents, nor does it appear that Erwin sought to conceal its contents. No evidence is found in the record to show that there was anything in said paper contrary to what Erwin represented, nor that Mr. Root, a lawyer present and disputing the propriety of the heirs signing it, could not have freely examined its contents if he desired.

After the conversation between Mrs. Cornue and respondent had been related by her, and the incidents of said meeting at the Massasoit House had been narrated by many witnesses on the part of appellant, John A. Davis was recalled for further cross-examination by appellant's counsel, and testified to the following effect: That prior to the said meeting at the Massasoit House, he had not seen his brother Erwin but once during a

period of more than thirty years, and that the one occasion was ten years ago, when they met and were together about two hours; that before reaching the Massasoit House on the occasion mentioned, he had no communication whatever with his brother Erwin; that he did not know what correspondence passed between his son Andrew and his brother Erwin. He related the incidents of meeting his brother Erwin and his aged sisters when he arrived at Springfield, Massachusetts, in charge of his deceased brother's body, and narrated what little conversation he had with Erwin prior to the funeral and on his return therefrom, up to the time of said meeting of the heirs, which meeting occurred after dinner on the day of the funeral. He positively denies any secret meeting or conversation with Erwin, and denies that he entered into, or thought of entering into any combination with Erwin.

After the aforementioned testimony was introduced on the part of appellant, his counsel offered to prove by him the following facts in opposition to John A. Davis for letters of administration on said estate, to wit: "That shortly prior to the visit of Mr. Root to Montana, in the early part of March, this year, his uncle Erwin stated to him that there was no doubt his brother Andrew would shortly die; that Andrew could not live much longer; that his estate would have to be taken charge of and administered upon; that the proper persons to control the administration were himself (Erwin), Mr. Root, and Mrs. Cornue; that they could select some one to take charge of it; that there were very few of the heirs who needed anything; that there was no reason why many of them should receive anything; that the interests of most of them could be acquired, if he (Erwin) controlled the administration, for very little; that the possession of money would be an injury to most of them; that if he could get control of the administration, he could do pretty much what he pleased toward acquiring the interests of the others; that something, of course, would have to be done for Andy in Butte (meaning Andrew J. Davis, Jr., a nephew of deceased); that he, Henry A. Root, should have all he was entitled to; that brother John would have to have his share; that the only one of the others that could give him (Erwin) any trouble would be Smith, of California, and that if he resisted

he would law with him until he got sick of it; that if there was a will that they wanted to have stand, they could have it stand, if they were on the inside; that if there was a will that they did not want to have stand, they could overthrow it, if they were on the outside; that it would be necessary to go to Montana to carry out the arrangement, get charge of the estate, and put it into the hands of some one representing them; that as for Diana, he could get her, if he had control of the administration, to accept a deed to the house she occupied and a few hundred dollars a year; and that the house was not worth over one thousand dollars."

This proffered evidence was rejected by the court upon objection on the part of respondent, as being incompetent and immaterial, to which ruling appellant excepted, and the same is assigned as error.

At the same time appellant further offered to prove, "that, on the conclusion of the meeting at the Massasoit House, Erwin Davis said to Mr. Cornue, 'What is the matter with Henry? [meaning Henry A. Root] I thought he understood the arrangement between us; he was to be in; that speech of his has cost me some millions.'" In making this offer appellant by counsel said: "I offer to prove that he made these remark last mentioned to Mr. Cornue, and separately to Mrs. Cornue, but I have no right to say, and do not say, that it was within the hearing of John A. Davis."

Upon objection by respondent's counsel to the introduction of that testimony, on the ground that it was incompetent and immaterial, the court refused to allow the same to be proved, to which action appellant excepted, and assigns the same as error. Mr. Cornue testified to this same matter, on his examination as a witness on the part of appellant, in which testimony he said: "The conversation in the hall between Erwin and me, just referred to by me, was somewhat of a whispered conversation between Erwin and me." On motion, that part of Mr. Cornue's testimony wherein he related said conversation was stricken out by the court, which action of the court is excepted to, and is assigned as error.

The manager of the Western Union Telegraph office at Butte, in obedience to a subpœna *duces tecum*, brought into

court a number of telegrams which he said had passed since the 14th of February, 1890. These telegrams were offered to be read in evidence on the part of the appellant. The court examined said telegrams, and on finding that the same had passed between Erwin Davis and his nephew, Andrew J. Davis, Jr., said the court would exclude them on the objection made by counsel for respondent, on the ground that John A. Davis was not shown to have any knowledge of said telegrams, and accordingly said telegrams were excluded. This action of the court was excepted to, and is assigned as error.

The only theory upon which said evidence which was stricken out or excluded could be admissible against John A. Davis, is that the existence of a conspiracy between him and his brother Erwin, to defraud other heirs, had already been established by competent proof. Had that conspiracy been established? By proof of what transaction, incident, or act are we to find that John A. Davis had conspired with his brother Erwin to defraud other heirs of their rightful shares of said estate? These brothers had not met for more than thirty years, except for the brief space of two hours, some ten years ago, until they met on that solemn occasion, at the Massasoit House, on the morning of their brother Andrew's funeral. It was in evidence that no communications had recently passed between them. Indeed, it does not appear that they had communicated with one another for a period of ten years. Up to this time the evidence shows no fact which gives the slightest color of credence to the allegation of such conspiracy. Even if we take Mrs. Cornue's version of her conversation with her uncle John as absolutely true, there was no reference in it to the fact that John and Erwin proposed to co-operate together.

On the arrival of John at the Massasoit House in charge of his deceased brother's body, he found awaiting him several aged sisters, his brother Erwin, and a number of other relatives of deceased. John tells in his testimony, on cross-examination, what occurred both prior to the funeral and after that event up to the time of said meeting of the heirs. It amounts to nothing more than a narrative of a hasty greeting between these brothers and sisters, who had scarcely met between youth and old age; the preparation for the funeral; the journey of

ten miles to the burial place; the obsequies; the return to the Massasoit House; the partaking of a late dinner together with all these heirs present, after which the meeting occurred. No delay was made to give convenient time and opportunity for these alleged conspirators to meet in consultation. John is questioned on cross-examination as to whether he had a private or secret interview with his brother Erwin on the day of the funeral, prior to said meeting of heirs, and positively negatives all such questions. None of the seven witnesses who were there and testified to the circumstances, intimate that such an interview occurred. So that up to the time of the meeting we have no evidence to show that any such an alleged conspiracy had been formed. Neither is there any evidence to show that John had any knowledge of Erwin's fraudulent designs, if they existed. At the meeting John coincided with one remark of Erwin, as to the time it would take to settle the estate in Montana.

This may have been an honest belief. If he was mistaken, we cannot say that it was not an honest mistake. He advised his sisters to sign the paper authorizing Erwin to represent their interests in Montana. There could be no vice in this as far as shown, because it does appear that it might not, under certain circumstances, be expedient, provided the person delegated was a trustworthy agent. There is nothing to show that John did not honestly and firmly believe in his brother Erwin's integrity when he advised signing such a paper. Mr. Root also expressed the idea that it would be proper for these heirs to be represented in Montana, for he said to them at said meeting that he was going to represent himself and sister, and if any of them wanted him to look after their interests he would do so with pleasure. If John A. Davis was conspiring with his brother Erwin to carry out the alleged fraudulent purpose, it is a strange circumstance that he sat in said meeting and heard Mr. Root contradict Erwin, both as to facts and as to the propriety of his advice to the heirs, and yet he offered no remarks calculated to put Mr. Root in a false light, or discredit his statements.

Is it not unnatural for a man, desperate enough to conspire for the consummation of such a nefarious scheme, inspired by

the same hope, bent on achieving the same result, to calmly and quietly sit by and hear a co-conspirator contradicted as to his statements, and challenged as to the expediency of his advice? —especially at the critical moment when the silent conspirator might exert a strong influence in turning the current of action in favor of the common purpose? It is said that John should have risen up and contradicted Erwin at said meeting. The record shows two good reasons why he did not do this. *First.* John says in his testimony that he said nothing to the heirs assembled there; that he had no chance to do so. *Secondly.* If there was any necessity for contradicting Erwin's remarks at said meeting, Mr. Root did so immediately after Erwin spoke. When it is considered in this connection that the record discloses that Erwin's remark at said meeting as to the existence of a will was founded on information received directly from deceased, according to Mr. Root's testimony; that his statement as to newspaper reports, greatly overestimating the value of the estate, was true; that his statement as to the report that there was a person in Iowa who claimed to be a son of deceased was well founded; that his remarks about the probability that litigation would arise, and that it might be found that deceased owed debts, and as to the time required to settle the estate, were mere suggestions,—there was little to call for a contradiction from any one.

In our view the court committed no error in striking out and excluding the evidence mentioned, on the ground that no conspiracy had been established. Even if that evidence had been admitted, we fail to see how it could have strengthened appellant's theory in respect to the alleged conspiracy, or how it would have involved John A. Davis therein. In the whispered conversation between Mr. Cornue and Erwin Davis, in the hall of the Massasoit House, offered in evidence, Erwin is reported as saying: "What is the matter of Henry? [meaning Henry A. Root] I thought he understood the arrangement between us. He was to be in, and you were to be in." No reference is made to John A., and it is admitted that this remark was not within his hearing. Had this evidence been admitted, there was nothing in it for John A. to defend against or explain, unless it was to deny that he had any knowledge of the *arrangement* which

Erwin mentioned as being understood between himself and Mr. Root.

In the evidence offered to be proved by Mr. Root on his own behalf, Erwin is reported as having sought out Mr. Root, and not only made a confidant of him, but named him as a party to Erwin's alleged fraudulent scheme. Erwin is reported as having laid before Mr. Root the details of his alleged fraudulent scheme. He is reported by Mr. Root as having introduced this subject by saying: "Andrew would shortly die; he could not live much longer; that the estate would have to be taken charge of and administered upon; that the proper persons to control the administration were himself (Erwin), Mr. Root, and Mrs. Cornue." Then he is alleged to have gone on and unbosomed his fraudulent plans and purposes to Mr. Root. This occurred in New York. John A. was several thousand miles away at the time. In the course of this interview Erwin said "that it would be necessary to go to Montana and carry out the arrangement, get charge of the estate, and put it in the hands of some one representing them." John A. was living in Montana, the trusted brother and companion of Andrew, whose estate was the subject of this alleged plot. Why the necessity of going to Montana, "and carry out the arrangement, get charge of the estate," etc., if John A. had joined, or was relied upon to join, the others in consummating this alleged fraud?

It is in evidence that Mr. Root had been educated by his uncle Erwin until he arrived at the age of about eighteen years. It also appears by the evidence that at the time of said interview, and for some time prior thereto, Mr. Root was the attorney for his uncle Erwin, attending to most of his law business, which was considerable. According to Mr. Root's own testimony, shortly after said alleged interview, he came to Montana, arriving the 2d or 3d of March. He found his uncle Andrew sick and unconscious, and was informed by the attending physician that his uncle Andrew could not recover. He then interviewed two attorneys and counselors of his uncle Andrew, in respect to Andrew's affairs, and as to whether he had made a will. Having learned what he could from them, he sought and obtained an interview with his uncle John, the respondent, in which Mr. Root proposed himself as a proper party to take

part in the administration of his uncle Andrew's estate. Mr. Root stayed in Butte about one day, then returned to Helena, consulted lawyers, and found it was necessary to be a resident of this State to be qualified for appointment as administrator. Thereupon he declared to some parties his intention to become a resident of this State, hired desk room in his lawyer's office, left direction to have his name proposed for membership of a club, and on the sixth day of March left here on his return to New York. Five days later his uncle Andrew died. Mr. Root says he had quite a long talk with his uncle John while in Butte on the occasion mentioned, but there nowhere appears an utterance throughout the whole range of evidence to show that Mr. Root mentioned to his uncle John the alleged fraudulent propositions of Erwin Davis, which had been made to Mr. Root, according to his proffered proof, shortly before he left New York to come to Montana. So far as the evidence discloses, he kept the alleged fraudulent plans and arrangement of Erwin a profound secret until he offered to swear to the same at the trial. It does not even appear that he warned his aunts, or even his aunt Diana, whom he says was named by Erwin as an intended victim of the alleged fraud. So that, as far as can be gathered from the evidence, respondent went to the meeting at the Massasoit House without the slightest warning to arouse his suspicions against his brother Erwin. Even there, when Mr. Root made remarks, he failed to inform the heirs of Erwin's alleged designs.

It is further asserted by appellant that John A. Davis harbored a design to join with Jefferson Davis, the alleged illegitimate son of deceased, and attempt to take the whole estate by virtue of the alleged son's heirship. This accusation is based upon certain remarks which John is alleged to have made.

Mary E. Cummings testified that on the forenoon of the next day after said meeting of the heirs at the Massasoit House, she had a conversation with her uncles John and Erwin, in the parlor of said house, in the presence of her mother, her sister, Mrs. Cummings, and her aunt Diana. The witness testifies that at first they were engaged in social talk, and afterward the conversation turned on the question of the heirs signing said paper for Erwin; that her mother then stated that she had

decided not to sign said paper, for the reason that her children were not willing that she should do so; that Erwin then said he should not ask her again to sign the paper, nor allow her to do so; that he would go to Montana and represent himself. Then John remarked, as this witness testifies, "in a threatening manner," that he would go out and represent himself, and added, by way of a threat, "I can go in with the boy and take the whole." The witness says she then turned to her uncle Erwin and said, "If he can do that, a smart lawyer certainly can," and that Erwin replied, saying, "No, no; he does not mean that."

We have carefully considered this testimony, not only as to its substance, but also in relation to the circumstances which surrounded the parties speaking, and the other testimony recorded in the case. In itself this testimony shows that what is quoted by the witness must have been a mere fragment of some conversation, of which the context is not given. This is apparent from the sentence quoted, "I can go in with *the boy* and take the whole." The witness does not relate that anything had been said about any boy during that conversation. We are left to infer that "the boy" referred to was some person who had been spoken of in the conversation. It is no doubt a fair inference that the person who had been mentioned was the alleged illegitimate son of deceased, and that when John said "the boy" he referred to that person. If the conversation, of which the remark quoted is evidently a fragment, was laid before the court, it would probably show whether an evil or an innocent intention was the motive of that remark.

One of the persons whom this witness named as present at said conversation was a witness before the court, and testified on behalf of appellant, but she gave no testimony as to the substance of the conversation just referred to. If John A. Davis made such remarks, and "in a threatening manner," or "by way of a threat," it is strange that the sister, Mrs. Ada Cummings, who was present, and who testified in court on behalf of Mr. Root, says nothing about an occurrence of such importance, and so calculated to harrow the feelings of these expectant heirs. We only have such a fragmentary and disconnected report of it as to require inference or supposition to connect it

with the party referred to; but we have evidence of the same witness to the effect that when she spoke to her uncle Erwin about said remark made by John, placing a certain meaning upon it, Erwin corrected her, saying John did not mean that.

It should also be observed in this connection that if John A. Davis entertained thoughts of joining with said alleged son to attempt to claim the whole estate through his relationship to deceased, as appellant insists, this brings to light another conspiracy at least contemplated or threatened by John, while at the Massasoit House. According to this theory John is placed in the attitude of conspiring at one moment with Erwin to get charge of the estate and defraud certain heirs of their inheritance, and at the next moment, in the presence of Erwin and other heirs, seriously threatening to go in with a person whose claims, if established, would defeat Erwin and all the heirs who met at the Massasoit House, including John himself, of all hope of succeeding as heirs to this vast estate.

The record shows that at the Massasoit House much was said by some of the heirs assembled there about said illegitimate son in Iowa. Erwin suggested that some one be authorized to settle with that individual, to avoid litigation and scandal, and it appears that John favored that plan. It is apparent that a person, in discussing this matter with the fairest motives, may have said, "I can go in with the boy and take the whole," if in using that expression it was only meant to urge the importance of arranging a settlement, or authorizing some person to attempt it. The context would be the best guide to show what the motive of the speaker was. John testifies that when he mentioned the said alleged son, in conversation with Mrs. Cornue, he used expressions somewhat similar in import. He testifies that he said: "The big danger is this boy in Iowa that is making the claim. There is danger and trouble. I said anybody can take that boy and can prove anything down in Iowa. I said I could take the boy and prove anything."

It appears by the testimony of respondent, that after the meeting at the Massasoit House, the other heirs having failed to concur in any arrangement to settle with said Iowa claimant, Erwin, on his own responsibility, authorized respondent to pay said claimant twenty-five thousand dollars to quiet his claims and avoid

scandal, and that Erwin said he would furnish said sum, and take his chances on the other heirs bearing their proportion of such outlay. Respondent testifies that such settlement, if made, was to inure to the benefit of all other heirs. That upon the suggestion respondent went to Iowa on his way West, but was unable to see said claimant. Respondent further said in his testimony: "Erwin and several of us have combined in a common defense against the Iowa boy. There is no agreement with me that is inimical to the interests of the other heirs of this estate. If Erwin has any such design I know nothing of it."

The record shows that on the day following Andrew's death, John A. Davis caused to be made, and he verified a petition for his appointment as administrator of the estate, in which he estimated the value thereof at four and one half million dollars, and named all the living brothers and sisters of deceased, and the issue of deceased brothers or sisters, as the heirs of said Andrew J. Davis, deceased. In this petition he made no mention of said alleged Iowa claimant. This petition he caused to be filed in court on the twenty-eighth day of March, before he returned from the East. There is no proof that John A. Davis has done any act in favor of said alleged son of deceased, or in violation of the rights of others who claim to be heirs to said estate. The attack upon the integrity of John A. Davis is not made by way of allegation and proof of any dishonest act, or default committed by him during a long life; but the attack on his integrity is made by construing certain expressions or suggestions, by way of advice, to mean that since the death of Andrew he has developed into a monster of depravity, and is disqualified to take the office of administrator by reason of want of integrity.

In drawing the proper conclusion from testimony of the character under consideration, it may be necessary for the court to weigh the testimony of divers witnesses by considering their appearance and manner of conduct on the witness stand, and all the elements which add to or detract from the weight which should be given to testimony. From such legitimate reasons, the court, before whom the witnesses testified, may have disregarded or given very little credence to certain testimony which is made the basis of appellant's charges against John A. Davis.

It is not the province of this court to pass upon the credibility
of witnesses, or to decide delicate questions as to the weight of
the utterances of diverse witnesses, whose testimony is brought
here in the record. That province must be left to the judges
and jurors before whom the witnesses appear and speak.

At the trial Andrew J. Davis, Jr., was called as a witness on
the part of his father, John A. Davis. This witness testified
that he was the confidential agent and business manager of his
uncle Andrew for a long time prior to Andrew's death, and
knew about the effects of deceased. The witness testified gen-
erally as to the character and value of the assets belonging to
the estate. On cross-examination it was developed that this
witness claimed to own certain shares of stock in the First
National Bank of Butte, formerly belonging to deceased, by
virtue of a gift and actual delivery thereof to him by his uncle
Andrew, at the time the latter was preparing to go to Tacoma,
a few months prior to his death. The details of this alleged
gift were inquired into, and the witness related them. Another
witness was called and testified to the same effect. Respondent,
John A. Davis, was questioned regarding the same matter on
cross-examination, and said he did not know; that he had heard
it said that his brother Andrew, shortly before the latter's death,
had given said bank-stock to Andrew J. Davis, Jr. The wit-
ness further said he did not recollect of ever having asked his
son Andrew whether or not that rumor was true.

It is urged that this fact, that respondent's son has a claim
adverse to the interests of the heirs of said estate ought to dis-
qualify respondent to take the office of administrator, on the
theory that the respondent would be likely to favor his son's
claim. This fact has no bearing upon the question of John A.
Davis' integrity, nor upon any other ground of disqualification
alleged against respondent. A man of the most upright charac-
ter and of the strictest integrity, and free from all disqualifying
conditions prescribed in the statute, may have a son who claims
interests adverse to other claimants of an estate. It would be
clearly unlawful to set aside the father's right to letters of
administration on such a pretense as that. If a dispute arise
between Andrew J. Davis, Jr., and other claimants of said bank-
stock, the law has ample facilities and methods to bring such

dispute to trial and determination, independent of the desires of the administrator. The said claim of Andrew J. Davis, Jr., is against the interests of his father, John A. Davis. The legal presumption is that a man acts in favor of his own interests. (*Higman* v. *Stewart*, 38 Mich. 513.) If we are to understand that appellant contends that John A. Davis would presumably act fraudulently in aid of his son's claim, it must be answered that no such presumption arises from the mere relationship of father and son. The legal presumption is that a man acts honestly and without fraud. Fraud is never presumed. (*Hatch* v. *Bayley*, 12 Cush. 27; *Oaks* v. *Harrison*, 24 Iowa, 179.) The legal maxim is, *Odiosa et inhonesta non sunt in lege præsumenda.* So it is said by Lord Coke: "In an act which partaketh both of good and bad, the presumption is in favor of what is good, because odious and dishonest things are not to be presumed." (Co. Litt. 78 *b*; *Jackson* v. *Miller*, 6 Wend. 228; *Habersham* v. *Hopkins*, 4 Strob. 238; 53 Am. Dec. 676; *Stewart* v. *Preston*, 1 Fla. 10; 45 Am. Dec. 621.) In this connection the testimony of John A. Davis, to the effect that he had no knowledge of the claim of his son to said bank-stock, is criticised as evidently untrue. There is no evidence in the record to show that this is untrue, but the argument is made from inferences of relationship. The presumption is that a witness speaks the truth. (§ 619, Code Civ. Proc.) Moreover, if John A. Davis is a man who would testify falsely, and desired to aid his son Andrew in support of the claim to said bank-stock, how easily and plausibly could John have given evidence in support of his son's claim, considering that John was the constant companion of his brother Andrew for a long time prior to the death of Andrew.

In defense against the attack made upon his integrity by appellant, respondent, John A. Davis, called a number of witnesses, who testified to the effect that they had known respondent a long time, and knew his reputation as to integrity in the community in which he lived, and that his reputation was good. The reception of this evidence is assigned as error. We have no hesitation in pronouncing the action of the court correct in receiving said testimony as to respondent's general reputation for integrity, where one of the questions at issue was his want

of integrity. Appellant specifies that the court erred in considering the request of sundry heirs for the appointment of John A. Davis. We find nothing in the record showing that the court considered such a document, nor that the consideration thereof was objected to, or an exception saved upon such question. This court will not consider an assignment of error under such conditions.

Upon the views hereinbefore expressed, we are of the opinion that the order of the court below in overruling the objections to the appointment of John A. Davis, also the motion for a new trial, and granting to him letters of administration on said estate, ought to be affirmed, and it is so ordered, with costs.

DE WITT, J., concurs.

BLAKE, C. J. (*dissenting*).—I regret to announce that, for the first time since the organization of the government of this State, a judgment will be pronounced herein by a divided court. I think that the principles which control the issues of drunkenness, improvidence, or want of understanding in these proceedings have been laid down with legal precision. I concur in the opinion of the majority in upholding the implied findings of the court below, that John A. Davis should not be adjudged incompetent to be appointed the administrator of the estate of Andrew J. Davis, deceased, by reason of these objections which have been alleged, heard, and tried. There is a substantial conflict in the evidence upon the cause of drunkenness, and upon this ground alone the ruling under review can be sustained. The testimony of the respondent with reference to his excuse, which he submitted under oath to the District Court, and by which he secured exemption from service upon the jury in the case of the *Territory* v. *Clayton*, 8 Mont. 8, is contradictory and unsatisfactory. He uses the words "citizen" and "resident" regardless of their exact meaning. In one answer he testifies: "I have excused myself . . . . by saying that I was a resident of Chicago. I excused myself on account of citizenship about three years ago." His statements are consistent with both theories of guilt and innocence, and I am willing to give him the benefit of the doubt and dismiss the charge of perjury.

I have not been able to find in the authorities a satisfactory definition of the term "integrity," which is in the statutes *supra,* relating to the competency of an administrator. Its meaning should not be restricted to what is generally understood by the word "honesty," although the last is properly deemed by lexicographers a synonym. The administrator holds a trust of the highest character, and should act with strict impartiality in the collection of the property of the estate of the deceased, and the payment of the assets to the heirs. When the duties of the position are considered, it is evident that the want of integrity, which renders a person incompetent to receive this appointment, should be defined. The following definition by Webster is apposite: "Freedom from every biasing or corrupt influence or motive." The court below was called upon to determine judicially from all the evidence, not merely whether John A. Davis was an honest or a dishonest man in the ordinary signification of words, but whether he was free from all bias, influence, or motive, which would interfere with the exercise of his functions as an administrator of the estate of his deceased brother. In arriving at a correct decision of this issue it will be necessary to observe the conflicting interests of the heirs, and the relationship of the parties who are asserting demands, which are hostile to the estate, and the conduct of John A. Davis concerning these matters.

Andrew J. Davis died March 11, 1890, and was buried on the eighteenth day of the month in the town of Somers, State of Connecticut. John A. Davis subscribed and verified, two days after the death of his brother, a petition for letters of administration upon the estate, and afterwards accompanied the remains of the deceased to the family burying ground. The petition, which alleges that the value of the real and personal property of the decedent is about four and a half millions of dollars, was not filed until March 28, 1890.

We will notice other facts about which there is no controversy. The capital stock of the First National Bank of Butte, in this State, is one hundred thousand dollars, and the undivided profits amount to the sum of six hundred thousand dollars; nine hundred and fifty of the one thousand shares of this bank stand upon the books thereof in the name of the

deceased, A. J. Davis. A. J. Davis, Jr., is a son of John A. Davis, and was called twice to the witness stand in his behalf, and testified upon cross-examination that the certificates representing these shares were given to him in December, 1889, by his uncle; that they were not indorsed; that his brother, John E. Davis, voted the stock in the following January at a meeting of the stockholders under a proxy given by the said A. J. Davis; and that he claimed them as a gift. James A. Talbot, who testified for John A. Davis, corroborated A. J. Davis, Jr., respecting the conversation between the parties in December, 1889, about the disposition of the stock certificates. The members of this bar, who appear for John A. Davis in these proceedings, stated in this court that they are the attorneys for A. J. Davis, Jr., in maintaining his right of ownership in these shares of bank-stock. I do not wish to express an opinion which will convey an intimation of my views of this contention, but I do insist that it is the duty of the administrator of the estate of the deceased to resist in every court this claim of A. J. Davis, Jr., and obtain by a resort to legal remedies, if necessary, the possession of this property. Upon this subject, which involves the sum of six hundred and sixty-five thousand dollars, John A. Davis testified: "I don't know that I ever heard it said that my brother Andrew, shortly before his death, gave his stock in the First National Bank of Butte to my son Andrew. I do not recollect of ever having asked my son whether or not that rumor was true." A. J. Davis, Jr., testified that his father, during the past two or three years, "has been representing my uncle Andrew, the deceased, in different capacities. My uncle told me after father left the grocery business that he did not want him to pin himself down to any active business; that between his Iowa affairs and the bank he could keep him occupied. He told me there were some old papers in the bank that needed looking after, and that my father was a very good hand at that, and could take charge of those matters, and he told me to pay him liberally for his services." When this testimony is weighed, showing the knowledge of John A. Davis of the affairs of the bank and the deceased, his ignorance and neglect to inform himself upon business of such vital importance to the estate as well as to his son, are inexplicable. This, however, is a digres-

sion. It is a presumption upon which we can act, when the contrary is not shown by the record, that John A. Davis will be governed by bias and the influence of parental love in favor of his son in this matter, and that he will not therein protect vigilantly the interests of the estate. It is the policy of the law to exclude men from such a trial, and the authorities bearing upon this proposition will be examined hereafter.

But assuming that this state of facts is insufficient to justify the Probate Court in refusing to appoint John A. Davis the administrator of the estate, it should compel a rigid scrutiny of the evidence with reference to his qualifications. I am unable to reconcile his conduct with honesty or integrity in the treatment of the heirs of the deceased. After the funeral, a meeting of some of the relatives was held at the Massasoit House in Springfield, State of Massachusetts. Among those present were two sisters, Miss Diana Davis, aged seventy-six years, and Mrs. Sarah M. Cummings, aged sixty-nine years, two brothers, John A. Davis and Erwin Davis, and a number of nephews and nieces. Erwin Davis made some remarks upon this occasion, and the transcript contains the testimony thereof by Miss Cummings, Mr. Cummings, Mrs. Cummings, Mr. Ladd, Mrs. Ladd, Mr. Cornue, Mrs. Cornue, and Mr. Root. In ordinary cases, the general effect of the proof may be stated, but when the court is divided, and vast interests are involved, prolixity is unavoidable, and I will quote the language of each witness:—

Mrs. Cornue testified: "If there is a will, an estate can be settled within five years. Yet at the end of five years there might not be a dollar for any of us. If there is no will, it will take ten years, and at the end of ten years there probably might not be a dollar for us, as there will necessarily be great litigation. He spoke of there being debts very likely, and he said it was reported that there was an illegitimate child, and that if there was, that there would not be a dollar left for any of us. . . . . And then he turned to uncle John and said: 'You have lived in Montana and know the laws of Montana, am I not right about the time it takes to settle an estate?' And uncle John said: 'Yes, it takes from five to ten years to settle an estate in Montana.' . . . . He (uncle Erwin) mentioned five

years as the shortest time in which the heirs could receive any-thing, and then only if there was a will. . . . . And if there was not a will, ten years was the shortest time in which they could get anything."

Miss Cummings testified: "He (Erwin Davis) also stated that if there was a will it was possible that the estate could be settled in five years, and if there was no will it would take ten years or more before a distribution of the estate could take place. . . . . He spoke several times in this way: 'If there be an estate.' . . . . I think those were his words. Near the close of his remarks he turned to his brother John and asked him if he was correct about the laws of Montana, as he (John) had lived there, and John replied that he was; that it took about ten years to settle an estate in Montana. Uncle Erwin said that if there was no will, everything might be used up in litigation. He said he knew there would be large debts. I am sure he used the word 'large' in speaking of the debts."

Mr. Cummings testified: "He (Erwin Davis) went on to state that if there was a will it would take five years to settle the estate in Montana; if not a will, from five to ten years. And if there was any estate for us it would be obtained after a great deal of litigation. He spoke of the difficulty of settling an estate in a new Territory, and after speaking of that he turned to uncle John and asked him if he was not right. And uncle John said he was; that it would take from five to ten years to settle the estate."

Mrs. Cummings testified: "Erwin Davis said at that meet-ing that if there was no will that would be the worst possible complication of the affair, and that in that case it would take from five to ten years to settle up the estate, if there was any estate, which remarks he made several times, 'if there was any estate.' He said there would probably be large debts. . . . . At the close of the statement he asked uncle John if he was right about its taking so long to settle up an estate in Montana, and uncle John said he was, and that it would take from five to ten years."

Mrs. Ladd testified: "He (Erwin Davis) said it was to be hoped there was a will, because, in that case, if there was any-thing coming to us we might get it in five years, and if there

was no will it would be ten years, and perhaps we would never get anything. . . . . If the public administrator got it it would be used up in litigation, and there would probably be very little, if anything, left. He said there was one that claimed to be an illegitimate child, and that if there proved to be such a child, he would claim all, and there would be nothing left for us. At the close of the remarks he turned to uncle John and asked him if he was right about settling an estate, as he had lived in Montana and knew the laws of Montana, and uncle John said: 'Yes, it would probably take from five to ten years to settle an estate.'"

Mr. Ladd testified: "He (Erwin Davis) further said that it was to be hoped that there was a will, in which case the property might be settled so that the heirs would receive what they were entitled to within five years; that if there was no will considerable litigation would necessarily follow, which would probably take so much time that it would be ten years before any division of the estate could be made, even if there was any of it to be divided. . . . . There was a son who claimed to be an illegitimate son, and if he came forward to claim the estate, he could claim it, and there would be nothing left for anybody else. . . . . He said there were probably large debts against the estate. Those were his words, as near as I can remember them. . . . . He thought the estate would be settled in five years if there was a will, but that it would take ten years if there was no will. He then turned to his brother John and asked him: 'Is that not so, John? You have lived in Montana, and know the laws out there.' And John Davis replied: 'Yes, you are right; it would take from five to ten years to settle an estate in Montana.'"

Mr. Cornue testified: "He (Erwin Davis) said if there was a will it would take five years to settle the estate, and if there was no will it would take ten years. He said there were debts against the estate. . . . . At the close of his remarks Erwin turned to his brother John and said to him: 'You have lived in Montana and know the laws there, what do you say?' And uncle John said: 'Yes, that is right; it takes from five to ten years to settle an estate there.'"

Mr. Root testified: "He (Erwin Davis) said that a will had

been made a considerable period before that, and with codicils, and that it was to be hoped that there was still such a will; and that in case there was a will, whoever was entitled under it would receive what was given to him in five years; and if it should turn out that there was no will, the estate could not be settled for ten years, and perhaps not then, as necessarily there would be a great deal of litigation; and then he added that, will or no will, we must take care of the indigent members of the family; . . . . that it was reported that there was an illegitimate son; that if it should turn out that there was such a son, that son would inherit everything, and there would be nothing for us; that, instead of the estate being divided into elevenths there would be but one portion, and that that son would get it. . . . . He said something about there being debts, though I cannot remember just what, but the impression left upon my mind was that he said that it would be found that uncle Andrew had large debts. . . . . He turned to his brother John and said: 'Brother John, am I right about the length of time it takes to settle an estate in Montana? You live there and you know.' And uncle John said: 'Oh yes, about five or ten years to settle an estate in Montana.'"

The effect of these statements of Erwin Davis, and of the apparent concurrence of John A. Davis in their accuracy, upon the heirs who composed his audience, can be readily seen. They were addressed to persons who lived thousands of miles from Montana, and had no knowledge of the financial condition of the deceased, or the laws of this State which regulate the distribution of estates. The youngest of the brothers and sisters of the decedent was then sixty-three years old, and confidence would be naturally reposed in John A. Davis. He had been, according to the evidence, the trusted agent of his deceased brother, and possessed the information which the relatives at that time needed. He then knew that the deceased owed small sums, if anything; that the value of this estate exceeded seven million dollars; and that the settlement of estates in Montana did not require five or ten years, or any similar period of time. It was the duty of John A. Davis under these peculiar circumstances to have told the whole truth, but he deliberately refused to afford his kinsmen any light, and said nothing about his

petition for letters of administration, which had been prepared before his departure from this State in the same month. The respondent is silent in his testimony concerning these remarks of Erwin Davis, and all that he says upon the point is embraced in the following brief sentences: "There was a meeting of the heirs at Springfield, Massachusetts, after the funeral. I said nothing to the heirs assembled there. I had no chance to do so. I might have talked to the individual members of the family, but not to them when assembled." The absurdity of this excuse is evident when the record is looked into. All the foregoing witnesses, Mr. and Mrs. Cornue, Mr. and Mrs. Ladd, Mr. and Mrs. Cummings, and Miss Cummings testify that there was a pause at the conclusion of the speech of Erwin Davis, and Mr. Root, in substance, observed: "If no one else had anything to say, he had." At this gathering of an informal nature, there was nothing which could prevent John A. Davis from having a "chance" to talk. Another part of the evidence should be commented on in this connection wherein John A. Davis says: "Erwin is here in the city, and has been for ten days. I have seen him every day of that time." If any of these witnesses had erred in stating the remarks of Erwin Davis, it was within his power to correct them, but he did not vindicate this privilege by going upon the stand. The court below, in my opinion, did not give to this evidence, which is not controverted, its proper weight.

In another particular, I think that John A. Davis is proved to be wanting in integrity. Erwin Davis requested the heirs at this meeting to sign an instrument of some character which conferred upon him some authority to represent them in the settlement of the estate. Root, the appellant, opposed this action, and advised every one of them to consult an attorney before he signed any paper, so that he could realize fully the consequences. Mr. Cummings testified: "After Mr. Root had finished, and had gone out, and the rest of the company, uncle Erwin said to uncle John, 'What was the matter with Root?' He asked uncle John if he supposed Root had been drinking, and uncle John said he thought so. Uncle John also then said not to have anything to do with a lawyer; that he had had a good deal of law business, and found it was very expensive,

and that there were but few honest men among lawyers." Mrs. Cummings testified: "He (John A. Davis) also said that it was necessary to be united in the affair, and he turned to me and said: 'We don't want any lawyers to be mixed up in it at all; that there were very few honest men among lawyers.' That if they got mixed up in it the estate would go in litigation." The listeners would infer from these statements that John A. Davis did not intend to protect his interests in the estate with the aid of attorneys, but the following portions of his testimony show his duplicity: "Between the time my brother Andrew died and the time I left here with the body, I saw counsel here. My son Andy was with me at the time. I told Andy to see Judge Dixon and have him draw a petition for letters of administration for me. I had not seen Mr. Forbis or his firm prior to signing the petition. It was my son Andy who saw them. I instructed Andy to employ Forbis and Forbis."

The same spirit of unfairness or deception upon the part of John A. Davis is shown in his efforts to assist Erwin Davis in procuring the signatures of the heirs to the written instrument which has been referred to. Miss Cummings testified: "The meeting adjourned until one o'clock the next day. On that next day I had a conversation with my uncle John and uncle Erwin; my mother was present, also my sister, Mrs. Cummings, and aunt Diana. The conversation was in the forenoon, in the parlor of the Massasoit House. We were engaged in social talk at the first, when uncle Erwin asked my mother and aunt Diana if they were ready to sign that little paper. And my aunt Diana said: 'Oh, oh, no; wait until the rest come. You said I might be the last to sign it.' Uncle John spoke and said: 'If no one makes a beginning, if no one signs first, it will never be done,' and he related a little story to illustrate his meaning. He said his wife was sick at one time, and he went to engage a nurse, and she would not go without a hired girl; and he went to get a hired girl, and the hired girl would not go without a nurse. After uncle John had told that story my mother told uncle Erwin that she had decided not to sign any paper. Erwin told her, 'Very well. Then I shall do nothing for you. I shan't ask you to sign again; indeed, I shan't allow

you to sign if you wish to; I shall go out to Montana and do for myself.' And my uncle John spoke up and said: 'So shall I go out and do for myself.' Both Erwin and uncle John spoke in a threatening manner; both of them. And uncle John added, by way of threat, 'I can go in with the boy and take the whole.' That was in uncle Erwin's presence, and in my mother's presence, and in Diana's presence. I then turned to uncle Erwin and said: 'If he can do that, a smart lawyer certainly can.' And Erwin said, 'No, no; he does not mean that.' Uncle John said to my uncle Erwin that it was ignorance on our part that made my mother refuse to sign the paper. He said that impatiently. I said in answer to that: 'I don't blame you for calling us ignorant, for we are ignorant, and we wish to know what we are doing.'"

Mrs. Cummings testified about the same interview: "Mr. Erwin Davis asked Diana Davis if she was ready to sign the paper, and she did not want to sign. She wished to wait until the other sisters came, and not to sign first. Mr. John Davis said that it was necessary for some one to sign first; that if they all put it off, they would never make a beginning." John A. Davis testified: "I do not remember of a power of attorney being procured by brother Erwin to be signed by some of the elderly sisters. I do not remember of any endeavor by brother Erwin to get such signatures to a power of attorney in his favor. I myself did not make any endeavor to get any of the parties to sign for Erwin." I have already observed that Erwin Davis was not called as a witness, although he was in the city of Butte during the hearing. The topics upon which John A. Davis swears that he talked are mentioned in his own words: "As to the character of the conversation during that time, I had not seen my old sisters for about thirty years, nor my nephews or nieces; it was a sort of pleasant sad meeting. . . . . He (Erwin Davis) asked about my health, and I asked about his, and I joked my old sisters a little; told them they looked younger than I expected to find. They told me I looked young. That was the general character of the conversation." This is a clear admission from the lips of John A. Davis that he never communicated to his relatives a single fact regarding the estate of the deceased. The occasion demanded of him

candor, but everything within his knowledge was studiously concealed.

It is proved by the testimony that Erwin Davis is indebted to this estate in the sum of five hundred and thirty-six thousand dollars, which is evidenced by five promissory notes, that were kept in the vaults of the First National Bank of Butte. It is also shown that the deceased in his lifetime conversed thereon with A. J. Davis, Jr., Mr. Cornue, Mr. Root, and Mrs. Cornue. A portion of this indebtedness has been due since the first day of January last past, and there are good reasons for thinking that Erwin Davis does not intend to pay the same, and that the entire amount may not be recovered for the benefit of the estate. There seems to have been some mysterious purpose in the acts and declarations of Erwin and John A. Davis to mislead the heirs. Twenty-nine telegrams, which passed between Erwin Davis and A. J. Davis, Jr., were offered in evidence and inspected by the court, and excluded upon the sole "ground that the applicant, John A. Davis, was not shown to have any knowledge" of them. These persons seem to have intimate relations respecting this estate, which could not be settled in the ordinary course of correspondence. The testimony of John A. Davis is another remarkable instance of want of knowledge, if not integrity, by one who was paid liberally for his fidelity to the business of the deceased. "I have never heard that my brother Erwin owed him anything." A question of veracity arises between John A. Davis and Mrs. Cornue which I will not notice, for the view of the court upon this conflict cannot be disturbed. John A. Davis visited the so-called illegitimate son in the State of Iowa before his return to Butte, and prior to the filing of his petition for letters of administration, and testifies: "Erwin and I, and several of us, have combined in a common defense against the Iowa boy."

When all the evidence is compared, I am forced to draw the following conclusions: A. J. Davis, Jr., asserts a claim to personal property, which *prima facie* belongs to this estate, and is of the value of six hundred and sixty-five thousand dollars, and he and the attorneys who have been retained to litigate his rights in the first place are also employed by John A. Davis in these proceedings. Erwin Davis is indebted to the estate in

the sum of five hundred and thirty-six thousand dollars, and is striving to evade the payment thereof, and by his attorney advocates the appointment of John A. Davis as the administrator. But these parties, whose attitude is that of open war against the heirs of this vast estate, are united in supporting John A. Davis for the administratorship, and in opposing the application of Henry A. Root for the trust. The objections to Mr. Root rest upon the ground of his non-residence, and do not affect in any degree his ability or integrity. The "Iowa boy" did not offer any testimony in the court below, and is not represented in this hearing, and the combination of Erwin and John A. Davis against him appears to have been entered into without a just cause. The pretensions of this child, and the law applicable to him, have been misrepresented by Erwin and John A. Davis to weaken the confidence of the heirs in their inheritance and induce them to sacrifice their rights. None of the facts affecting this estate, which were within the breasts of Erwin and John A. Davis, have been revealed to the relatives. A conspiracy has been formed by A. J. Davis, Jr., Erwin Davis, and John A. Davis to defraud the heirs, and the court below erred in excluding the testimony showing all their acts and declarations in furtherance of its objects. The appointment of the respondent as the administrator will enable A. J. Davis, Jr., and Erwin Davis to gain their ends respectively by collusion, in the waiver of the proof of material facts, or the confession of allegations, having no other foundation than perjury. On the other hand, the selection of Mr. Root would be the most efficient mode of defeating the schemes of A. J. Davis, Jr., and Erwin Davis for the spoliation of this estate. The argument of counsel for the respondent that the administrator will give a good bond, conditioned according to law, does not remove the danger which has been pointed out.

In *Stearns* v. *Fiske*, 18 Pick. 24, Mr. Justice Wilde, as the organ of the court, said: "It appears that the appellant was very much under the influence of Barker, a debtor to the estate to a large amount, and who is charged with combining with the intestate, in his lifetime, to defraud his creditors. The appellant's application for administration was made at his request, and not to protect or subserve her own interest. This

influence might and probably would be exerted to the prejudice of the creditors, had the appellant been appointed adminis-tratrix, and if they might have a remedy against her on her bond, it would increase the expense of litigation, for the recov-ery of which the creditors could have no legal adequate remedy. And besides, an administrator, if so disposed, may prejudice the interests of those for whose benefit the estate is adminis-tered, without being exposed to any action."

In *Drake* v. *Green*, 10 Allen, 124, Mr. Justice Hoar, in the opinion, says: "Thus, for example, a person who applies for administration may have interests conflicting with those of the estate. The probability that these would prove an embarrass-ment in the proper performance of his duty might be a suf-ficient reason for a refusal of the judge of probate to intrust him with the administration." In *Putney* v. *Fletcher*, 148 Mass. 247, the court say: "An executor or administrator is deemed unsuitable when he has any conflicting personal interest which prevents him from doing his official duty." In *State* v. *Bidlingmaier*, 26 Mo. 483, the court, by Mr. Justice Scott, say: "So, in effect, Adolph Kehr, as administrator of one estate, is prosecuting a suit against Adolph Kehr, as administrator of another estate. How is the defendant's estate to be protected? It is not for Kehr, with the bias on his mind, to determine whether it is indebted or not. That estate should be defended by one who has not an interest that it should go undefended." In *Moody* v. *Moody*, 29 Ga. 519, there was a "contest between two brothers for administration on the estate of their father," and the court, in speaking of one of them, said: "And so of the other fact, that he was claiming for himself a large part of the estate left by his father. If this were true, his interest was hostile to the interest of the estate, and estates, like everything else in life, are generally better off in the hands of their friends than in the hands of their enemies." In *Pickering* v. *Pendexer*, 46 N. H. 69, the court discussed the fitness of Pickering to serve as an administrator, and said: "It would seem that he asserts a claim to a considerable portion of the land in the occu-pation of the deceased at his death, and that this claim is con-tested by the heirs; and it may be the duty of the administrator to contest this claim, or at least to investigate it thoroughly,

and determine fairly whether it ought or ought not to be contested; and that for neither of the duties would he be a suitable person. It is argued by his counsel that he must give bond for the faithful discharge of all his duties; and that is true; and yet we think it would not be a sound exercise of discretion to appoint a person whose interest is clearly opposed to that of the persons for whom he acts." In *Ellmaker's Estate*, 4 Watts, 34, the court says: "But again, there is reason to believe that the appellant has attempted to overreach the heirs, by trumping up a false account against the estate. The least taint of fraud is a conclusive objection. It works a legal incompetency to perform the duties of the office: an office of such trust and confidence as should, under no circumstances, be committed to a person wanting in good faith, and in whom confidence cannot be reposed." In *Bieber's Appeal*, 11 Pa. St. 157, the court say: "The able opinion of Mr. Justice Rogers, in *Ellmaker's Estate*, 4 Watts, 38, is directly in point. . . . . It was further held in that case, that the right of one Swartswelder was properly rejected on the ground of expediency. The objection is insurmountable when he stands as a litigant party in opposition to the other heirs. Courts have constantly declined putting in persons as administrators so situated. This is a strong case. Here Isaac was already in possession of more than half the estate. It is said he claimed it as a gift from his mother. This position rendered him an incompetent person to perform the duties of the office of administrator, which is one of trust and confidence, and ought to be committed to a person who has no interest in opposition to the other heirs of the estate." Mr. Gary, in his work on Probate Law, writes: "A person is not suitable merely because he is ready to give a bond with sufficient sureties, because parties damaged by official misconduct may be subjected to expense of litigation for which they can have no adequate remedy, and an administrator may prejudice the interests of parties interested without being exposed to an action on his bond. When there is good reason to suspect that the purpose is to promote some interest adverse to that of the heirs or creditors of the estate, it would seem that the person would be unsuitable." (§ 267.) In *Thayer* v. *Homer*, 11 Met. 104, the court say: "But unsuitableness implies no want of

capacity or mental infirmity, but an unfitness arising out of the situation of the person in connection with the estate of which he is administrator, either by reason of his being indebted to it, or having claims upon it, or in the interest he has under a will, or his situation as an heir at law."

While the application of some of these cases may be limited by the statutes under which they were made, the legal doctrines which are announced are undoubtedly correct, and would prevent the appointment of the respondent as the administrator of this estate. I maintain this proposition, when the testimony is weighed. But the relations of the parties have been radically changed by the fact which has been brought to the attention of this court by the attorneys for John A. Davis. They have caused to be filed with the record in the case the photographic copy of a will of the said Andrew J. Davis, deceased, which in effect gives to John A. Davis the entire estate, subject to "a lifetime maintenance" for three persons, who are not the lawful heirs. The executors who are nominated in this instrument have departed this life, and John A. Davis filed, July 25, 1890, in the court below a petition duly verified, which concludes with the following prayer: "Wherefore, your petitioner prays, that the order hereinbefore mentioned, made by this court on the 28th of April, 1890, appointing him administrator of the said estate, be vacated and set aside; that the said will, a copy whereof is hereto annexed, be admitted to probate in this court and established by the judgment thereof; that the usual order be made fixing the day for the hearing of this petition, and due notice thereof be given to the heirs at law and devisees under said will of said deceased; and that the letters of administration, with the said will annexed thereto, be issued to your petitioner." This new matter should be treated like the suggestion to this court of the death or disability of a party, or the transfer of his interest in an action or its settlement pending an appeal. The respondent, who has voluntarily produced this supplemental record, must abide by the consequences of his conduct. It is conceded by counsel that the appellant has filed objections to the probate of this will on the ground of its invalidity, while Erwin Davis and A. J. Davis, Jr., support the petition of John A. Davis, and admit that the document is

genuine and legal. The harmonious combination of these three members of the family continues unbroken, although the instrument will "cut off" Erwin Davis without any share of the estate. The unfavorable conclusions which have been already stated are strengthened, if possible, by these strange and seemingly inconsistent acts of the parties. They remove any doubt which may have been entertained concerning the state of hostility between John A. Davis and some of the heirs of this estate, and demonstrate that his appointment is in conflict with the authorities, and one "not fit to be made."